472 A.2d 1083

**Thomas J. FUREY**

v.

**THOMAS JEFFERSON UNIVERSITY HOSPITAL and Gerald Marks, M.D., and Melvin Moses, M.D.**

**Appeal of Gerald MARKS, M.D.**

Superior Court of Pennsylvania.

Argued Sept. 14, 1983.

Filed Feb. 10, 1984.

Petition for Allowance of Appeal Denied May 8, 1984.

214

Allan H. Starr, Philadelphia, for appellant.

Gustine J. Pelagatti, Philadelphia, for appellee.

Before CAVANAUGH, MONTEMURO and HESTER, JJ.

MONTEMURO, Judge:

This matter is before the court on the appeal of Gerald Marks, M.D., the defendant/appellant in this malpractice action. Thomas J. Furey, the plaintiff/appellee, was admitted to the emergency room of Thomas Jefferson University Hospital on November 9, 1970, with complaints of severe abdominal pain. Dr. Marks operated on appellee several hours later. While appellee concedes that Dr. Marks' operative performance was proper, he contends that the operation itself was not indicated. The case was tried before a jury from March 24, 1981, through March 31, 1981. A verdict was returned for appellee in the amount of $75,-000.00. Motions for a judgment n.o.v. and a new trial were filed by appellant and denied by the lower court. This appeal followed from the denial of the post-trial motions.

While appellant has asserted several grounds of error, we find that the first two assignments of error are crucial and prove to be dispositive. We reverse and remand for a new trial.

## I. IMPROPER ADMISSION OF TESTIMONY.

The first contention which we address involves the trial court's allowance of testimony by appellee's medical expert. Specifically, appellee's medical expert testified, over objection, that a handwritten result on a laboratory slip was "460" units. Appellant further complains that this error was exacerbated rather than cured by the ensuing judicial comments.

Careful review of the record compels us to agree. An examination of the parties' respective theories of the case reveals that the jury's resolution of whether the disputed result was "460" or "<160" was a pivotal issue, and that admission of the challenged testimony was gravely prejudicial. Scrutiny of the context of the testimony and the subsequent judicial comments demonstrates that the prejudicial error was far from cured.

Appellee's theory of the case was presented through one expert witness, Dr. Robert P. Bass, Jr.[1] Dr. Bass is an osteopathic, Board Certified family practitioner who had practiced for twenty-five years at the time of trial.[2] Dr. Bass testified that appellee entered the hospital suffering from acute pancreatitis, an inflammation of the pancreas. Dr. Bass based his diagnosis of pancreatitis on the results obtained from a laboratory test for serum amylase. He opined that an elevated amylase result was the "hallmark" of pancreatitis. Furthermore, he declared that the laborato-

1. Appellant also argues that Dr. Bass, as a general practitioner, should not have been qualified by the trial court as an expert on the particular subject involved, i.e., the "acute surgical abdomen." Appellant assigned as error the trial court's failure to strike the entire testimony of Dr. Bass.

2. Dr. Bass was not appellee's treating physician, but was retained as an expert for trial. He examined appellee once briefly, and testified primarily from the hospital records.

ry slip indicated that appellee's amylase was "460" units, which represented an elevation from a normal range of 60 to 200 units.

Given this "cardinal" sign of pancreatitis, Dr. Bass stated that the recognized treatment for appellee's condition was nonsurgical. He testified that in ninety-five percent of all pancreatitis cases, the symptoms resolved almost "spontaneously" within forty-eight to seventy-two hours, with only close observation and supportive treatment including hydration, intravenous fluids, and possible antibiotics to prevent infection.[3]

In response to inquiries regarding appellee's documented bacterial infection, Dr. Bass testified that the bacterial infection could not have been significant because appellee did not have an accompanying fever. Laboratory results from a blood sample taken before the operation showed the presence of Escherichia coli (E. Coli) bacteria. Dr. Bass admitted that the existence of E. Coli in the body outside of the digestive system signified an infection in the body, and if the infection reached the blood stream it could possibly become a life-threatening situation. Dr. Bass testified, however, that even in instances of overwhelming infection, treatment should be restricted to antibiotic therapy.

It was Dr. Bass' ultimate opinion, therefore, that appellee had pancreatitis and a mild bacterial infection, neither of which required surgical intervention. This being so, appellant did not, according to Dr. Bass, conform to reasonable standards of the medical profession in that he exposed appellee to the unnecessary risk of surgery and the complications which followed thereafter.

The defense presented three expert witnesses, including the defendant/appellant, to substantiate their position that surgery was not only a proper course of treatment, but an essential one. The defense experts were Dr. Charles C. Wolferth, a Board Certified general surgeon who has prac-

3. Dr. Bass noted two exceptions where surgery was recommended for pancreatitis, both instances being of a chronic nature, and neither of which he believed appellee to have had.

ticed since 1954; Dr. George P. Rosemond, a Board Certified general and thoracic surgeon who was retired at the time of trial, having practiced from 1934; and the appellant, a Board Certified general, colon and rectal surgeon who has practiced since 1951.[4] The testimony of these three medical experts was that at the time appellee was admitted to the hospital, he was in a state of shock from an overwhelming and life-threatening bacterial infection. Because of this infection and irrespective of its source, the defense experts testified that emergency surgery was required.

While the cause of the infection was not located during the exploratory surgery, the defense experts were adamant that there were no indications of pancreatitis. The appellant, Dr. Marks, suspected that the infection was caused by a perforated diverticulitis,[5] and Dr. Wolferth suggested that the infection originated from inflammation and leakage of the sigmoid colon. Both of these diagnoses accounted for the appearance of E. Coli bacteria in the abdominal cavity. A lavage of the abdominal cavity was performed to cleanse out the abnormal, infectious fluid, and then drains were inserted and the incision packed closed.

The defense countered Dr. Bass' diagnosis of pancreatitis by attacking the serum amylase result which Dr. Bass claimed to be "460". Dr. Bass had professed no knowledge of the clinical procedures for serum amylase testing at Thomas Jefferson University Hospital in 1970. The defense presented Dr. Schwartz, Director of the Clinical Laboratory of Thomas Jefferson University Hospital. Dr. Schwartz testified that he was familiar with that hospital's laboratory procedures in 1970 and at present, and that because of the

4. Drs. Wolferth and Rosemond did not treat appellee but testified on the basis of the facts reported in the hospital records.

5. Diverticulitis is the inflammation of a diverticula which is a pouch which opens off the gut. Diverticulitis occurs especially in small pockets in the wall of the colon which fill with stagnant fecal material and become inflamed, and may cause obstruction, perforation, or bleeding. When perforated, gastrointestinal substances (including E. coli bacteria) are emitted into the abdominal cavity. *See Steadman's Medical Dictionary* (24th ed. 1982).

way the test was performed, it was impossible for a value of "460" to be obtained, while it was common to reach a result of "<160." Dr. Schwartz explained the serum amylase test and the equation utilized to get the amylase reading. This testimony was undisputed, as was testimony that the laboratory slip results were "called up" to the emergency room surgical resident who then transcribed them in his report to appellant.

It can hardly be argued that Dr. Bass' interpretation of the serum amylase result was anything but inadmissible testimony. Appellee, in fact, completely avoids discussion in his brief on the propriety of this testimony. The scope of expert testimony is limited:

> Expert testimony is permitted only as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman. McCormick, Handbook on the Law of Evidence, § 13, (2nd ed. 1972); *Commonwealth v. Newsome*, [462] Pa. [106], 337 A.2d 904 (Filed 1975); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A.2d 58 (1971). Where the issue involves a matter of common knowledge, expert testimony is inadmissible. *Collins v. Zediker*, 421 Pa. 52, 218 A.2d 776 (1966).

*Commonwealth v. O'Searo*, 466 Pa. 224, 229, 352 A.2d 30, 32 (1976).

■ Here, Dr. Bass lacked any special expertise which would qualify him to decipher the numerical notations on the laboratory slip—he was neither a handwriting expert, nor was he the preparer of the document. The source of Dr. Bass' interpretation was common knowledge, for which expert testimony is impermissible. His testimony on this subject was a usurpation of the jury's traditional function and manifestly erroneous.

■ To justify a reversal because of a ruling on evidence, the ruling must not only be technically erroneous, but it must also be harmful to the appellant. *Anderson v. Hughes*, 417 Pa. 87, 208 A.2d 789 (1965). We do not

hesitate to find prejudice here. The ultimate issue before the jury was whether surgery had been necessary; i.e., whether they believed Dr. Bass' version or whether they believed the defense version. The jury obviously decided the issue in favor of Dr. Bass' version. Since the crux of Dr. Bass' testimony was that appellee had pancreatitis, and that diagnosis hinged on his interpretation of the serum amylase result as "460", the improper admission of Dr. Bass' repeated and steadfast translation of that result was "460" was fatal to appellant's case. Where erroneously admitted evidence goes to the heart of the issue, this court must reverse and remand for a new trial. *Commonwealth ex rel. Buchakjian v. Buchakjian*, 301 Pa.Super. 213, 447 A.2d 617 (1982).

The trial court, however, refused to find error in its admission of this testimony. In its opinion denying the post-trial motions, that court held that the immediate instructions to the jury cured any potential for error.

The injurious line of questioning began when Dr. Bass was allowed to testify, over objection by counsel for appellant, that the hospital records included a laboratory report which recorded appellee's serum amylase as "460" units. Appellee's counsel had Dr. Bass reiterate this numerical value several times, over objection. The trial judge, apparently perplexed as to the reason for the persistent and strident objections,[6] ventured to look at the laboratory slip himself. After observing the slip and within hearing of the jury, he proclaimed, "It's a test with a number on it, 460." (Supplemental Record at p. 43).

Appellant's counsel respectfully protested, whereupon the trial judge gave the following instruction to the jury and

6. Counsel for appellant attempted to explain to the trial judge that while the accuracy of the hospital records was stipulated to, the interpretation of the notation representing the serum amylase result was not agreed to, and was a critical factual issue in the case. The trial judge refused to allow appellant's counsel to acquaint him with these details, and made it clear that any point counsel wished to make should be reserved for cross-examination.

then endeavored to clarify the problem himself by questioning Dr. Bass:

**THE COURT:** The jury will have to decide whether that is 460.

Again, ladies and gentlemen, it is not my opinion that matters. Maybe I am confused at this point, but it ultimately will be for you to decide, and we will wait to hear what cross-examination might clarify this. I don't prepare the basis. I am in the dark the same as you, and if I call it 460 and for some reason it is not, then, that is for you to decide.

**THE COURT** (Contd.) I will give this back to the doctor and you can pass that around to the jury at this point. It may assist them in understanding the testimony.

Before you do that, again with the same caveat from me, ladies and gentlemen of the jury, I was about to ask a question. I think that I should ask it.

Doctor, it has 'normal value' on this sheet. There is a whole column, this is a printed form, and it has a 60–200 units.

**THE WITNESS:** That's correct.

**THE COURT:** As I understand it, you are saying this particular hospital's formal (*sic*) value scope was within from 60 to 200 and that was on their printed form?

**THE WITNESS:** That's correct.

**THE COURT:** Then, immediately beside that in the column 'result' it has the number 460, subject to this being cleared up in your case by cross-examination, is that what you meant when you referred to the numbers, Doctor?

**THE WITNESS:** Yes.

**THE COURT:** And that 460, in your interpretation of this report it is that a test was done and the result was 460?

**THE WITNESS:** That's exactly right.

**Mr. STARR:** Your Honor, may I be heard?

**THE COURT:** I will pass this to the jury. You can cross-examine him about it. I don't want to go into it any further.

(Supplemental Record at pp. 43–44). At this point, the laboratory slip was marked as an exhibit and examined by the jury. Appellee's counsel then proceeded to stress that the amylase result was "crucial to the plaintiff's case" (Supplemental Record at p. 45), and had Dr. Bass state several more times that the result was "460." Thereafter, through his lengthy direct examination, Dr. Bass referred to the "elevated" amylase reading not as an assumption of fact or even his interpretation, but as a fact itself.

It was not until midway through Dr. Bass' cross-examination that the jury was advised of the controversy over the amylase result. The defense introduced into evidence the surgical resident's report which noted the serum amylase result after it had been called up from the laboratory. This exhibit was examined by the jurors, and counsel directed their attention to a comparison with other numerals on the report to determine whether the amylase was "<160" or "460." [7] Counsel for appellant also posed several questions in which he asked Dr. Bass to assume that the amylase result was actually "<160" instead of "460." Dr. Bass exhibited considerable difficulty in making such an assumption: "Q: ... You have agreed with me if it's less than 160 it's no hallmark? A: It's stated in two places in the record that it's 460." (Reproduced Record at p. 235a).

■ We are mindful that the admission of improper evidence can be cured by appropriate instruction from the court:

[T]he mere admission of improper evidence is not always ground for a new trial. Such an error may be cured and rendered harmless by striking out the evidence and eliminating it from the jury's consideration. *Lilly v. Metropolitan Life Insurance Co.*, 318 Pa. 248, 177 A.

---

**7.** Dr. Bass offered his uncalled-for interpretation that the report was written in two different handwritings, and an objection to this testimony by appellant's counsel was sustained.

778; *Mitchell v. Edeburn*, 37 Pa.Super. 223. However, if the evidence is of a sort that tends to prejudice the minds of the jurors, the error is not cured by instructions to disregard it. *Hamory v. Pennsylvania M. & S.R. Co.*, 222 Pa. 631, 72 A. 227. Whether or not the error is corrected, therefore, involves a consideration of the circumstances under which the irrelevant evidence was given and its probable effect on the jury. *Saunders, et al. v. Commonwealth*, 345 Pa. 423, 29 A.2d 62.

*McJunkin v. Kiner*, 157 Pa.Super. 578, 581, 43 A.2d 608, 609 (1945). Consideration of the circumstances here, however, forces us to conclude that the trial court's instruction failed to have any curative effect.

■ First of all, the trial judge's instructions were a response to the judicial comment only. He informed the jurors that *his* opinion did not matter, and never advised them that Dr. Bass' opinion did not matter either. To the contrary, he questioned Dr. Bass further to make sure that Dr. Bass' interpretation was that the result was "460". Thus, the supposed "curative" instruction served to highlight Dr. Bass' interpretation rather than to strike it from the jury's consideration.

Furthermore, any possibility that the instruction actually neutralized the effect of Dr. Bass' improper testimony was dashed by Dr. Bass' continued characterization of that result as "460" throughout his lengthy examination. While the trial judge had stated that this confusion might be cleared up on cross-examination, during the whole course of direct examination the jury had no inkling as to why "460" could be anything other than "460". To make matters worse, the laboratory slip was passed to the jurors immediately after both Dr. Bass and the trial judge had identified it as "460", and before they were aware of appellant's alternate interpretation. Of course, that laboratory result does resemble "460" in the absence of notice that it might be "< 160". By the time the jury was finally apprised of the "460", "< 160" conflict, it had already sat through at least a day of testimony by Dr. Bass who had persistently

referred to the elevated amylase level as a given. Unfortunately, the trial judge, in his charge to the jury failed to elucidate that the "460", "<160" controversy was an issue for them to decide.

Thus, we find that Dr. Bass' improper testimony constituted prejudicial error which was not cured by the instruction of the trial court.

## II. FAILURE TO CHARGE ON "TWO SCHOOLS OF THOUGHT"

■ We additionally find prejudicial error in the trial court's failure to give a submitted point for charge on the "two schools of thought" doctrine.[8] This doctrine is called into play in medical malpractice cases where there is more than one method of accepted treatment for the patient's disease or injury. The rule is that, where competent medical authority is divided, a physician will not be liable if in the exercise of his judgment he followed a course of treatment supported by reputable, respectable, and reasonable medical experts. *Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980); *Tobash v. Jones*, 419 Pa. 205, 213 A.2d 588 (1965).

Here, the medical authority on the treatment of a severe bacterial infection was diametrically opposed. Dr. Bass testified that treatment should absolutely be limited to antibiotic therapy. The defense experts stated that surgical intervention was imperative, and that it would have constituted malpractice to have failed to operate at once. Appellant asserts that on the basis of this testimony, the jury, if it found that appellee had a severe bacterial infection, should have been afforded the opportunity to conclude that

8. Although the trial court informed appellant's counsel that the "two schools of thought" doctrine would be covered in the general charge, the charge failed to encompass such an instruction. This omission was pointed out to the trial judge who insisted that he had covered the subject and noted counsel's exception. In its subsequent opinion denying the post-trial motions, the lower court recognized that the "two schools of thought" charge had not, in fact, been given. That court held, however, that the testimony did not warrant such a charge.

both methods of treatment were medically accepted and that appellant was not liable for following one accepted method even though the jury might decide that the treatment advocated by Dr. Bass was preferred.

One of the seminal cases in Pennsylvania on the "two schools of thought" doctrine is instructive. In *Remley v. Plummer*, 79 Pa.Super. 117 (1922), this court was confronted with a situation where plaintiff's and defendants' medical experts presented conflicting views as to the proper course of treatment. The court held:

> The question actually passed upon by the jury was not whether the defendants, in their handling of the case, had been guilty of negligence in not following a well-recognized and established mode of treatment, but rather, which of two methods, both having their respective advocates and followers of respectable authority, was the safer and better from a surgical standpoint. In other words, in the face of conflicting reliable expert evidence as to what was the proper course to be pursued by the surgeon in charge of the case, twelve laymen, with no knowledge of medicine and surgery were called upon to decide a disputed scientific medical and surgical question upon which eleven physicians and surgeons of standing and experience could not agree, and as to which there is a wide divergence of competent authority, and were permitted to mulct the defendants in damages for following a course of conduct which by far the greater number of the expert witnesses testifying said was in accordance with that indicated by the best modern surgical practice.
>
> . . . .
>
> Thus practitioners of a reputable school of medicine are not to be harassed by litigation and mulcted in damages because the course of treatment prescribed by that school differs from that adopted by another school: *Force v. Gregory*, 63 Conn. 167, 27 Atl. 1116; *Grainger v. Still*, 187 Mo. 197, 85 S.W. 1114; 21 R.C.L. 383; 5 *Thompson on Negligence*, section 6715. As was said in *Patten v. Wiggin* [51 Me. 594], *supra*, 'The jury are not to judge by

determining which school, in their judgment, is the best.' 'If the treatment is in accordance with a recognized system of surgery, it is not for the court or jury to undertake to determine whether that system is best, nor to decide questions of surgical science on which surgeons differ among themselves.': 30 Cyc. 1588, section 8.

. . . .

The testimony clearly showed a difference of medical opinion, expressed by physicians and surgeons of unquestioned standing and reputation, and the defendants were not negligent for having adopted the view held by the majority of their brethren who testified.

*Id.,* 79 Pa.Superior Ct. at 121–23.

■ In *Remley,* the standing and ability of each of the experts was not questioned and so the court reversed a judgment for the plaintiff and entered judgment for the defendants. A jury *may not* decide which of two respected methods of treatment is the better one. *Brannan, supra.* In *Tobash, supra,* the court noted that although "the instructions complained of permitted an inquiry by the jury unwarranted by the applicable law . . ." *Id.,* 419 Pa. at 217, 213 A.2d at 593, the appellant was favored by the instructions rather than harmed. It is evident, therefore, that where the evidence establishes "two schools of thought", the court as a matter of law must find a physician not liable for choosing treatment advocated by either school.

■ Here, however, an initial jury question was presented as to whether or not there were two competent medical viewpoints on the treatment of severe bacterial infections. The defense strenuously attacked the credentials and expertise of Dr. Bass [9] and both sides claimed that it would be malpractice to follow the treatment advocated by the other side. Faced with this testimony and unaided by the proffered instruction on "two schools of thought", the question actually passed upon by the jury was not whether the appellant had been negligent in not following a well-recog-

9. The qualifications of the defense experts were not attacked.

nized and established mode of treatment, but rather, which method was the "correct" one. *Remley, supra.* Absent the proposed instruction, the jury was not advised that it could find that both methods of treatment were proper courses of treatment, and that appellant would not be liable if he had followed either one. Thus, the requested charge was both accurate and applicable.

 The failure to give a requested point for charge, which is accurate and applicable, is reversible error if the appellant has been prejudiced. *Gombar v. Schaeffer,* 202 Pa.Super. 282, 195 A.2d 527 (1963). "An omission to charge which leaves the jury without discretion on an important question, or which plainly tends to mislead them, is cause for reversal." 2 P.L.E. Appeals § 491. We find that the failure to give a "two schools of thought" charge was prejudicial error.

 While the appellee's case de-emphasized the importance of the bacterial infection and stressed an alleged failure to diagnose pancreatitis, from the perspective of appellant's case, the issue of treatment of the bacterial infection was crucial. There was testimony by the defense that even if appellee had had pancreatitis, which they felt he didn't have, surgery should still have been performed because of the life-threatening bacterial infection. Since the undisputed evidence on the extent of the bacterial infection clearly indicated that appellee's bacterial infection was serious (i.e., E. Coli bacteria in the blood stream), the jury inevitably had to decide if surgery was a proper course of treatment for the bacterial infection, regardless of whether they found initially that appellant had failed to diagnose pancreatitis. Without being charged that they could find both surgical and non-surgical methods to be proper, the jury engaged in an impermissible weighing of the two alternatives. Thus, the jury was not advised of the allowable latitude of choice in reaching its decision. The appellant, who might have been absolved of liability if a "two schools of thought" charge had been given, was thereby prejudiced.

228

Accordingly, we reverse and remand for a new trial. This court does not retain jurisdiction.