715 A.2d 1108

**Hiren S. GALA, Appellant,**

**v.**

**Ralph HAMILTON, M.D., and Michael S. O'Connor, M.D., Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1997.

Decided July 22, 1998.

Daniel L. Thistle, Philadelphia, for Hiren S. Gala.

Allen H. Starr, for Ralph Hamilton, M.D.

Kenwyn M. Dougherty and Barbara S. Magen, Philadelphia, for Michael S. O'Connor, M.D.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

### *OPINION*

NEWMAN, Justice.

We granted allocatur in this matter to address the issue of whether a defendant must present medical literature to justify a "two schools of thought" instruction.

In March of 1988, Hiren S. Gala (Appellant) underwent surgery for removal of a schwannoma, a benign tumor on a nerve in his neck. His wife, who is a pathologist, first noticed the lump on her husband's neck in December 1987. Ralph Hamilton, M.D., a plastic surgeon, and Michael O'Connor, M.D. a neurosurgeon, (Appellees), performed the operation. Prior to the surgery, Appellees did not know which nerve was involved in the schwannoma because the area of the neck level

with the larynx and close to the base of the skull contains many nerves. They suspected that the vagus nerve, which controls the vocal chords, the larynx, and certain aspects of the esophagus, the heart and the intestines, might be involved. However, it was also possible that a branch of the spinal accessory nerve was involved. The surgical plan was to operate under local anesthesia so that Appellees could obtain a stimulus response from the patient during surgery when they palpated areas in the surgical field. Through such a response, the surgeons expected they would be able to identify the nerve around which the schwannoma had grown.

Once the procedure began, Appellees saw that the schwannoma had grown completely around what they thought to be a branch of the spinal accessory nerve, and they realized that to remove the tumor they would have to cut the nerve. They determined that repairing the damage would not be feasible because of the potential damage to other nerves if they attempted to perform a graft in the crowded area at the base of the skull where the carotid artery, the jugular vein and a number of nerves are located. Following surgery, Appellant was unable to speak, and Appellees determined that the schwannoma had grown around the vagus nerve, and not a branch of the spinal accessory nerve as they had previously believed. Appellant eventually regained his voice.

Appellant filed suit in the Court of Common Pleas of Philadelphia County (trial court), alleging that Appellees' failure to exercise reasonable care in removing the tumor caused permanent injury to his vagus nerve, and that he suffers from a speech impediment and difficulty swallowing and coughing. At trial, Appellant's expert testified that performing the operation under local anesthesia was negligent because it restricted the operative field and the ability of the surgeon to observe the operative field adequately. He testified that the use of local anesthesia increased the risk and was the cause of the injury to the vagus nerve. Each Appellee presented expert testimony supporting the decision to remove the tumor under local anesthesia. Eugene Meyers, M.D., a board-certified otolaryngologist with a sub-specialty in head and neck sur-

gery, testified for Appellee Hamilton. He testified that local anesthesia was used by a considerable number of reputable, respected physicians throughout the world in 1988 to remove tumors in the area of the neck where Appellant's tumor was located. He further testified that he has excised masses in that area of the neck under local anesthesia many times. Dr. Meyers cited the example of a doctor trained in otolaryngology who traveled to India where she would remove hundreds of thyroid tumors under local anesthesia. He noted that one potential complication of thyroid surgery is damage to the vagus nerve. In addition, he testified that the choice of anesthesia, whether general or local, does not make a difference in the outcome of the operation, and that excellent exposure of the surgical field is possible with either approach. Dr. Meyers also testified that the literature discussing removal of tumors from the neck does not indicate the type of anesthesia to be used.

Appellee O'Connor presented the testimony of a board-certified otolaryngologist, William M. Keane, M.D., who also has a sub-specialty in head and neck tumor surgery. He testified that performing surgery under local anesthesia allows for monitoring of nerve function, and that use of local anesthesia in surgery deep in the neck is a recognized technique. Furthermore, he noted that surgeons often use local anesthesia when operating on the carotid artery, which is located next to the vagus nerve. He testified that the literature regarding surgical excision of schwannomas does not indicate that general, rather than local anesthesia should be used. He also stated the choice of anesthesia does not affect the ability to determine the nerve involved with the schwannoma.

During the jury charge, the trial court gave the following instruction:

> Where there are two schools of thought in the use of local anesthesia, a physician may rightfully choose to practice under either school of thought. If you the Jury find as a fact that the Defendants followed a procedure recognized by reputable and respected, considerable number of medical experts in the use of local anesthesia, even if in the

minority, the Defendants would not be deemed negligent or in violation of the standard of care in the use of local anesthesia in 1988 and you must find for the defendants on this issue.

N.T. 7–26–94 at 77. The jury returned a verdict in favor of the Appellees, and the Superior Court affirmed. This Court granted allocatur on the limited question of whether medical literature must exist to support a two schools of thought jury instruction.

In *Jones v. Chidester*, 531 Pa. 31, 610 A.2d 964 (1992), this Court thoroughly reviewed the development of the two schools of thought doctrine, noting that it first appeared in modern Pennsylvania law in *Remley v. Plummer*, 79 Pa.Super. 117 (1922).[1] The Court made the following definitive statement regarding the standard applied in this Commonwealth:

> Where competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of recognized and respected professionals in his given area of expertise.

> In recognizing this doctrine, we do not attempt to place a numerical certainty on what constitutes a 'considerable number.' The burden of proving that there are two schools of thought falls to the defendant. The burden, however, should not prove burdensome. The proper use of expert witnesses should supply the answers. Once the expert states the factual reasons to support his claim that there is a considerable number of professionals who agree with the

---

**1.** Prior to *Jones*, it was unclear whether Pennsylvania adopted the quantitative or qualitative approach to the two schools of thought doctrine. In *Duckworth v. Bennett*, 320 Pa. 47, 181 A. 558 (1935), this Court held that a physician is not liable if "he followed a course of treatment advocated by a considerable number of his brethren in good standing in his community." *Id.* at 51, 181 A. at 559. In *Tobash v. Jones*, 419 Pa. 205, 213 A.2d 588 (1965), the Court approved a jury instruction based on a qualitative standard, in which the trial court informed the jury that a physician is not negligent if he followed a line of beliefs "subscribed to by reputable, respectable and reasonable medical experts." *Id.* at 216, 213 A.2d at 593. In *Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980), this Court returned to the quantitative standard set forth in *Duckworth*.

treatment employed by the defendant, there is sufficient evidence to warrant an instruction to the jury on the two 'schools of thought.' It then becomes a question for the jury to determine whether they believe that there are two legitimate schools of thought such that the defendant should be insulated from liability.

*Jones,* 531 Pa. at 40–41, 610 A.2d at 964. Initially, we note that *Jones* uses the general terms "competent medical authority," "the proper use of expert witnesses" and "factual reasons to support [the expert's] claim." *Jones* does not hold that the defendant's expert witness may only establish through medical literature that the defendant followed a course of treatment approved by a considerable number of recognized and respected professionals. However, Appellant asserts that such a requirement is implicit in *Jones,* and suggests that "the type of literature recognizing a school of thought should at a minimum be a current recognized medical text, a current respected peer review journal or the current recommendations of a national association." Appellant's brief at 11. Essentially, Appellant asks this Court to define "sufficient evidence to warrant an instruction" as a specific type of written evidence. However, Appellees assert that when this Court in *Jones* referred to "evidence," it did so recognizing the broad meaning of the term, which is defined as, "Any species of proof or probative matter, legally presented at the trial of an issue, by the act of the parties and though the medium of witnesses, records, documents, exhibits, concrete objects, etc. for the purpose of inducing belief in the minds of the court or jury as to their contention." Black's Law Dictionary 555 (6th ed.1990). Appellees suggest that by not placing restrictions on the comprehensive term "evidence," the *Jones* Court elected to allow medical experts to use any form of admissible proof to establish the existence of a school of thought.

The determination not to put strict limitations on the term "evidence" is consistent with the Court's decision not "to place a numerical certainty on what constitutes a 'considerable number' " of "recognized and respected professionals." *Id.* at 40, 610 A.2d at 969. In further support of maintaining a broad

definition of "evidence," Appellees note the following statement by this Court in *Jones:* "The burden of proving that there are two schools of thought falls to the defendant. The burden, however, should not prove burdensome." *Id.* at 40, 610 A.2d at 969. Limiting evidence to medical literature would have the effect of preventing expert witnesses from testifying to the existence of a school of thought based on their experience as practitioners and on information they obtained during their medical training and while attending lectures and other educational programs sponsored by institutions and professional societies. Furthermore, in cases where medical literature is silent with regard to certain techniques or treatments, the lack of written materials would necessarily be fatal to the defendant's claim. Such a rule is inimical to the flexible standard established in *Jones.*

In support of his position, Appellant turns to Pennsylvania case law and relies upon the Superior Court's decision in *Tesauro v. Perrige,* 437 Pa.Super. 620, 650 A.2d 1079 (1994). In *Tesauro,* a patient developed a dry socket after an oral surgeon removed a damaged molar in 1984. Following the extraction, the doctor administered an injection of alcohol near the area. Mrs. Tesauro was later diagnosed with muscle spasms caused by a damaged trigeminal nerve. She filed a dental malpractice action alleging that Dr. Perrige was negligent in administering the alcohol injection so close to the trigeminal nerve. The jury returned a verdict in favor of Mrs. Tesauro, and the oral surgeon appealed to the Superior Court. He asserted, inter alia, that the trial court erred by refusing to instruct the jury on the two schools of thought defense. At trial, Dr. Perrige testified that he was following a procedure discussed in a text published in 1975 by Dr. Archer, the former chief of oral surgery at the University of Pittsburgh. As his first expert witness he presented Dr. Totian, who testified that he had never given an alcohol injection to treat dry sockets and did not teach the procedure to students. Furthermore, he never testified that alcohol injections were proper and widely used in the treatment of dry sockets. Dr. Perrige then presented a second expert, Dr. Guernsey, who

supported the use of alcohol to treat dry sockets by citing the 1975 text referred to by Dr. Perrige and a reference manual written by a Dr. Shira during Dr. Guernsey's residency from 1959 to 1961. He testified that he never gave an alcohol injection to treat a dry socket and did not teach residents to follow this procedure.

The Superior Court noted that the manual by Dr. Shira was out of date, and that Dr. Archer's 1975 text arguably was also. Furthermore, the writings of one doctor are an insufficient basis to establish that a considerable number of practitioners agree with a course of treatment. In light of the fact that none of the defense experts testified that they had used alcohol injections to treat dry sockets, the Superior Court held that Dr. Perrige had failed to meet the burden of establishing two schools of thought.

Based on *Tesauro*, the Appellant asserts there must be competent medical literature to support a minority school of thought before a two schools instruction may be given to the jury. However, a careful reading of *Tesauro* indicates that it was not the lack of current medical literature, but the fact that none of the experts who testified at trial ever used alcohol injections to treat dry sockets, which led the court to reject the proffered defense. Had the expert witnesses testified to their personal use of the technique in question instead of relying on outdated materials, the result might have been different. Accordingly, *Tesauro* stands for the position that while factual support is required for a two schools instruction, it need not be in the form of medical literature, but may be testimonial.

Appellant also cites *Levine v. Rosen*, 532 Pa. 512, 616 A.2d 623 (1992), in which one of the issues raised was the defendant-physician's negligence in failing to order a yearly mammogram for the plaintiff. This Court stated:

> With respect to whether the doctor should have ordered a yearly mammogram, Mrs. Levine introduced evidence that the American Cancer Society recommended a yearly test for women over fifty years of age. The defendant introduced

> evidence that the American College of Obstetricians and Gynecologists recommended that mammography be performed 'regularly' for that same group.
>
> Unquestionably, the evidence established that there were a considerable number of respected physicians who subscribed to each school of thought – regular vs. yearly mammograms.

*Id.* at 520, 616 A.2d at 628. While recommendations of a professional society are a type of evidence that may be introduced to establish the existence of a school of thought, we are not persuaded that the Court's decision in *Levine* supports the Appellant's position that written materials are the exclusive means by which to prove the existence of a school of thought. Furthermore, we note that in *Jones*, where the issue was the use of a tourniquet to create a bloodless field for orthopedic surgery, the evidence that formed the basis for the two schools instruction was "testimony by medical experts supporting their positions." *Id.* at 33, 610 A.2d at 966. Similarly, in *Sinclair v. Block*, 534 Pa. 563, 633 A.2d 1137 (1993), a case involving the use of forceps to deliver a baby who had stopped moving through the birth canal, medical testimony established the existence of two schools of thought.

The two schools of thought doctrine has been part of Pennsylvania jurisprudence for more than seventy-five years, yet neither this Commonwealth nor any other jurisdiction has held that medical literature is a predicate to its application. The testimony presented in the instant matter illustrates why it would be imprudent to place such a restriction on the kind of evidence a defendant may present in support of a two schools of thought instruction. At trial, Appellee Hamilton testified as follows regarding the rarity of a tumor growing on a nerve, and his personal experience in performing neck surgery:

Q: And of the surgeries in the neck area that you have done, how many of those surgeries involved surgery of nerves either in close proximity to a tumor or involving a tumor itself?

A: Well, probably about 400 or so of those operations.

Q: And specifically of those about how many have been specific surgeries involving a tumor of a nerve itself, whatever cranial nerve it might be?

A: That's a very rare event. Generally, the dissection of nerves in the neck have to do with separating the nerve from an adjacent tumor of a different structure.... But the primary tumors of the nerves themselves are very relatively rare.

Q: How many of those would you say you have done?

A: Probably a dozen.

Q: Of the type of surgeries that you have been performing over the years ... you do surgery of this type under local from time to time, local anesthesia ... ?

A: Yes, local anesthesia as the combination of monitored anesthetic care with an anesthesiologist, intravenous sedation, and also local anesthetic, shorthand for which we call local anesthetic.

Q: And how many surgeries would you estimate you performed under local in the area of the neck that we are talking about?

A: About one in five would be performed under those circumstances.

N.T. 7–25–94 at 29–30.

Q: And in terms of creating the exposure to see what you are doing, was that affected by whether you use a general anesthesia or local anesthesia?

A: No, you could get excellent exposure with either form of anesthesia. Depending upon other factors, really, is the choice of anesthesia.

N.T. 7–25–94 at 37.

Appellee O'Connor testified as follows regarding the use of anesthetics in neck surgery:

Q: When you made your suggestion ... in your letter to Dr. Hamilton that a local anesthetic be considered, did you think that it was a radical suggestion?

A: Well, I knew it wasn't radical because I knew that rather deep operations were done in the neck, and I mean specifically carotid endarterectomies, which happened to be an area that I was very much involved in. And also thyroid tumors were done under local.

Q: Well, why isn't it just better for any kind of serious operation, why isn't it always a better idea just to use a general?

A: Well, I already said for feedback purposes I use it where general might seem to be used. It is the magnitude of the operation. You might say gee, this could be done under general. As it turns out, you could do an awful lot under local.

And in most cases, virtually all you can do under general. But under general has its own risk. . . .

Q: And in your letter where you made this suggestion about a local anesthetic, was your motivation because you didn't think a general would be safe for Mr. Gala or because you hoped to gain an advantage?

A: No, I hope I would be able to identify nerves in that area by, as I said, stimulus response. Not just necessarily the nerve that the tumor was on, but if we were inadvertently near another nerve that we might get a signal that this nerve is in the area even though it might be too small to see.

N.T. 7–25–94 at 135–137.

Dr. Meyers, Appellee Hamilton's expert witness, testified regarding his personal experience and that of his fellow physicians:

Q: Doctor, based on your knowledge and experience, are excisions of neck masses in this area done under local anesthesia?

A: Many are done under local, many are done under general. It depends on a number of things, not the least of which is the patient's choice. Some people hate the idea of being under general anesthesia, they are afraid they are going to die. . . . So if it doesn't make any difference

surgically in terms of exposure or relaxation of the patient and so forth, we usually leave it up to the patient as to whether they want a local or a general.

Q: Have you yourself used both local and general anesthesia in excisions that you have performed for masses in the neck area?

A: Many times.

Q: And would that include excision of tumors as we are talking about?

A: Yes.

Q: In various parts of the anatomy in the neck?

A: Yes.

Q: And, Doctor, to the best of your knowledge, your information and experience, is it within accepted medical standards, was it within accepted medical standards to perform surgery of the type involved in this case under local anesthesia back in March of 1988?

A: Yes, it is, the approach itself doesn't make any difference, I mean the anesthetic doesn't make a difference. . . .

Q: To the best of your knowledge and in your opinion, was the use of local anesthesia for excision in the area of the neck such as this something that was used by a considerable number of reputable, respected physicians back in 1988?

A: Yes, I think it is safe to say that throughout the country, and in fact throughout the world, there are many patients that are done under, where lumps in the neck are taken out under local anesthesia. There are some very good examples of that.

N.T. 7–21–94 at 39. On cross-examination, Dr. Meyers testified:

Q: Doctor, are you familiar with reported cases aside from here where physicians removed a schwannoma from the vagus nerve using local anesthesia?

A: The literature really doesn't – let me start over again. If you review the literature on the . . . few series that there are of people's experience with removing neurilemmomas in

the neck, it doesn't deal with what type of anesthesia is used. It deals with the surgical technique, it deals with the review ordinarily of the pathology report. The series deal with how did the patients do afterwards. Well, what functional problems did they have. It has to do with did they have a recurrence or not. I don't know that I've ever seen mention in the literature about whether local or general was used.

N.T. 7–21–94 at 109–110.

Dr. Keane, Appellee O'Connor's expert witness testified as follows on cross-examination regarding anesthesia and neck surgery:

Q: In fact, you said you did all this research of the literature: Have you found any case reported in the medical literature where they recommend using local anesthetic for surgery for removal of a schwannoma of the vagus nerve?

A: No, but I am not aware of a paper that says that you should use general, either. I mean I think there are techniques that you could describe when you do surgery.

Q: So as far as you know, Doctor, from your personal experience and from your research of the literature, the only doctors who opted to use local anesthesia to remove a schwannoma form the vagus nerve are these world-class surgeons; correct?

A: That's true.

Q: If I understand correctly on direct testimony you told us that it was accepted practice to use local anesthesia to remove a schwannoma from a vagal nerve?

A: I said that it was appropriate to use local anesthesia with dissection and surgery of the neck. That is a question of individual surgical preference....

N.T. 7–20–94 at 107–108.

In the instant matter the parties agree that there is no medical literature regarding the use of local or general anesthesia when removing a schwannoma from the vagus nerve. Accordingly, if we were to adopt Appellant's position, the trial court's decision to instruct the jury on two schools of thought

would be error. We believe it more prudent to allow juries to receive such an instruction where the testimony of expert witnesses alone establishes that a considerable number of recognized and respected professionals advocate the course of treatment followed by the defendant. Plaintiffs are free to challenge the basis for the expert's testimony on cross-examination, and the lack of medical literature supporting the expert's position may be raised at that time, and duly considered by the jury. To limit a two schools of thought instruction to cases where medical literature exists is antithetical to *Jones,* where this Court stated that the defendant's burden "should not prove burdensome." *Id.* at 40, 610 A.2d at 969.

For these reasons, we affirm the decision of the Superior Court.

CAPPY, J., files a concurring opinion.

NIGRO, J., files a dissenting opinion in which CASTILLE, J., joins.

CAPPY, Justice, concurring.

Although I find the position espoused by the dissent to be very enticing in its simplicity, the requirement that the only evidence competent to prove a second school of thought is that which is contained in the annals of medical literature is too extreme in light of the nature of the practice of medicine. With all due respect, I believe that the dissent fundamentally misunderstands the methods by which information is conveyed in the medical community; in short, I believe the dissent is approaching this issue solely from the perspective of a lawyer.

If the two schools of thought doctrine were somehow applied in a legal malpractice case, I would in all likelihood have few qualms about imposing the dissent's requirement. In the legal community, nothing is truly accepted until it is written down, preferably in an opinion by a judge. Yet, that is not the case in the medical community. A significant amount of valid information is passed along orally, such as on rounds or in conferences. To be sure, there is a great deal of information contained in the medical literature. Yet, a number of practi-

tioner's points are passed along orally or in other informal settings.[1]

Were we to adopt the dissent's position, we would exclude significant amounts of relevant evidence and thereby distort the process of determining whether a certain medical practice is a recognized second school of thought. I am not persuaded by the dissenting opinion that this would be a wise course of action to take. Therefore, as I believe that the majority has articulated the more sound approach, I join in that opinion.

NIGRO, Justice, dissenting.

I respectfully disagree with the Majority Opinion. For the following reasons I believe that medical literature is required before a two schools of thought jury instruction may be given, that Appellees did not meet the threshold to warrant a two schools instruction, and that the Superior Court should be reversed and the case remanded for a new trial.

The two schools of thought doctrine was created as a defense in medical malpractice cases in order to allow each legitimate medical approach to be judged on its own merits and not solely by the rules and principles of a different, albeit authoritative, way of thinking. Under this doctrine, a physician will not be held liable for exercising his judgment in choosing a course of treatment supported by reputable and respected medical experts even if other medical experts would favor a different course of treatment. *Trent v. Trotman*, 352 Pa.Super. 490, 496–97, 508 A.2d 580, 584 (1986). In essence, the two schools of thought doctrine is an effort not to inhibit the legitimate practice of alternative or "minority" treatment by medical practitioners.

The doctrine is rooted in the principle that juries, with their limited medical knowledge, should not be forced to decide which of two acceptable treatments a defendant physician should have performed. At issue here is what type of evidence will validate a second school of thought defense before

1. The majority expressed a similar opinion. Majority op. at 1111–12.

the trial judge may instruct the jury on the two schools of thought doctrine.

When two schools is asserted as a defense, the burden is on the defendant physician to prove that there are two schools of thought. *Jones v. Chidester*, 531 Pa. 31, 610 A.2d 964 (1992). In determining whether the instruction should be given, the trial court must initially evaluate whether the defendant has produced adequate factual support for his claim that competent medical authority is divided. *See Tesauro v. Perrige*, 437 Pa.Super. 620, 626, 650 A.2d 1079, 1082 (1994), *appeal denied*, 541 Pa. 627, 661 A.2d 874 (1995). I believe we should further refine *Jones* and require that, in order to establish adequate factual support that competent medical authority is divided, a defendant must provide medical teachings in the form of literature.

Such a requirement would recognize that a school of thought as it is used in the two schools doctrine is more than a spontaneous agreement among an ad hoc group of colleagues. Rather, it is by definition a more formal mode of practice, system or discipline with its own theoretical basis, medical principles and protocol. *See* 61 Am. Jur.2d: Physicians, Surgeons & Other Healers § 214 (1981) ("the school must be a recognized school of good standing, which has established rules and principles of practice for the guidance of all its members, as respects diagnosis and remedies, which each member is supposed to observe in any given case").

Further, in order to be a "school," the approach, technique, treatment or procedure must be communicated to others who adopt and follow those methods. The shared teachings only become a school when the followers are numerous and the protocol is established, understood, and embraced at least among the defined group of disciples. As such, a considerable number of reputable and respected practitioners has long been the requirement in Pennsylvania in order to constitute a school. *See Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980); *Duckworth v. Bennett*, 320 Pa. 47, 181 A. 558 (1935); *Remley v. Plummer*, 79 Pa.Super. 117, 121 (1922). The unadopted beliefs, writings and teachings of one individu-

al provide inadequate factual support for a school of thought. *See Tesauro*, 437 Pa.Super. at 627, 650 A.2d at 1083.[1]

The two schools of thought doctrine is a complete defense where "competent medical authority is divided." *See Jones*, 531 Pa. 31, 610 A.2d 964; *see also Furey v. Thomas Jefferson Univ. Hosp.*, 325 Pa.Super. 212, 226, 472 A.2d 1083, 1090–91 (1984). That determination can not be a casual exercise and must be based, at a minimum, on a proof that tenets and standards of the school have been "taught," (i.e., communicated) to its members before a jury is permitted to consider the defense. Thus, I believe professional literature descriptive of and in support of the defendant's course of treatment must be admitted into evidence in order for the trial court to determine as a matter of law that "competent medical authority is divided." [2] If the trial court so finds, a second school jury instruction must be given. It is then for the jury as fact finder to determine whether the physician, in the exercise of

1. The concurring opinion asserts that, in medicine, a "significant amount of valid information is passed along orally, such as on rounds or in conferences." However, in teaching hospitals, while "rounds" may be led by "reputable and respected" doctors, the information is primarily communicated to interns or residents who have not yet achieved the status of "reputable and respected medical professionals" themselves. Thus, as held in *Tesauro*, the unadopted teachings of one doctor, though he/she him/herself may be highly regarded, does not constitute a "school" for legal purposes simply because he/she shares his/her views with his/her students. Furthermore, the protocol at medical conferences or symposia is that a "reputable and respected medical professional" is invited to deliver his/her *paper* to the convening group. Unless and until other reputable and respected colleagues adopt the advocated approach, it is only a theory and not a "school." Nonetheless, should it become a school, its basis is always the *paper* prepared by the speaker through which his/her teachings are communicated. Thus, as in the law, a theory is merely a theory or an argument for a point of view until it is adopted, memorialized and disseminated for others to follow.

2. Appellant would have the requisite literature be a "current recognized medical text, a current respected peer review article or the current recommendations of a national association." I, however, would decline to further characterize the "literature." Rather, I would simply require that this literature must be descriptive of the approach taken, must have been available to the defendant at the time of choosing the alternative treatment, the defendant must have had knowledge of such literature and have consulted such in making the choice of treatment.

his or her judgment, followed a course of treatment advocated by a considerable number of recognized and respected professionals in his or her area of expertise. *See* Differing Schools of Thought Doctrine, S.J.I. 10.04 (Civ.).

In the instant matter, both Appellees O'Connor and Hamilton admitted at trial that neither had ever performed resection of a vagal tumor prior to Appellant's procedure. It thus goes without saying that neither had ever attempted such surgery under local anesthetic. Dr. Hamilton's expert witness was Eugene Myers, M.D., a board certified otolaryngologist with a subspecialty in head and neck surgery. Myers testified that in 1988 when Appellant's tumor was excised, a considerable number of reputable, respected physicians throughout the United States and the world used local anesthetic for the removal of tumors in the neck. However, the only examples he could offer were the practices of one colleague, a medical missionary physician-surgeon who operated in India where hospital facilities were scarce. He further testified that he himself used local anesthetic in such procedures. Dr. O'Connor's expert witness, William M. Keane, M.D., a board certified otolaryngologist with a subspecialty in head and neck tumor surgery, similarly testified that, while he never performed such surgery under local anesthetic himself, it was his opinion that the use of local anesthetic for procedures that deeply invade the neck is "appropriate." The Majority Opinion quotes this portion of his testimony, overlooking that he specifically declined to testify that it was an "accepted practice" to use local anesthetic under the circumstances. Thus, neither expert presented evidence that such was the practice of a "considerable number" of surgeons in this or any other first world country. Neither expert was aware of nor cited to any medical literature advocating the use of local anesthetic in this type of operation.

The record reflects that Appellees offered no evidence of medical literature, available at the time and consulted by them, supporting that competent medical authority is divided on the use of general or local anesthetic in the surgery performed on the Appellant. Thus, without such medical

literature, Appellees failed to establish that there was a school of thought whose selection by them would constitute a defense to their deviation from the medical standards of the majority.[3] Therefore, I believe the jury was improperly instructed on the two schools of thought doctrine. Such error is not harmless. In determining whether fundamentally erroneous instructions require the grant of a new trial, whether such instructions did or did not bring about the complained of verdict is not the question. If it appears that such instruction *might* have been responsible for the verdict, a new trial is mandatory. *D'Angelis v. Zakuto*, 383 Pa.Super. 65, 71, 556 A.2d 431, 434 (1989) (citing *Riesberg v. Pittsburgh & Lake Erie R.R.*, 407 Pa. 434, 180 A.2d 575 (1962) (emphasis supplied)).

As it appears that the two schools instruction permitted the jury to improperly consider that a second school of thought advocating the use of local anesthetic existed, I would reverse the order of the Superior Court and remand to the Court of Common Pleas for a new trial in keeping with the requirement that medical literature be produced in support of a second school before a two schools instruction is given.

---

**3.** In fact, the testimony presented by the defense experts in this case fails to establish competent medical authority is divided under *Jones*. Therefore, it was error for the trial judge to give the "two schools" jury instruction.