**Wetzel v. Shaffer**

*David J. Foster, Catherine M. Mahady-Smith,* and *Steve R. Pederson,* for plaintiffs.
*Andrew H. Foulkrod,* for defendant.

LEWIS, *P.J.,* October 18, 2005—Presently before this court is plaintiffs' post-trial motion in the nature of a request for new trial as to the following issues: did this court properly allow the presentation of the "two schools of thought" doctrine to the jury; whether defendants failed to prove the elements necessary for the "two schools of thought" defense; and whether this court erred in denying plaintiffs' *Frye* motion and in permitting the testimony of the sole defense expert Dr. Levin. The facts and procedural history of the case are as follows:

In July of 1996, Kay Perkins (decedent), a 53-year-old female with long-standing mitral valve stenosis,[1] was referred to Carolyn Shaffer M.D., a cardiothoracic surgeon with Shaffer Cardiovascular Associates, by her family physician, Dr. James Bower. Dr. Shaffer admitted the decedent to the Polyclinic Hospital on or about July 8, 1996, and, after determining the results from a cardiac catheterization, performed heart surgery on the decedent and inserted a prosthetic St. Jude valve into decedent's heart.

Following her release, the decedent became ill and was readmitted to Polyclinic on or about July 31, 1996, by Dr. Arif Shaik. The decedent was demonstrating signs of hemolysis,[2] which severely compromised the ability of her blood to provide sufficient oxygen to her tissues and organs. An echocardiogram (EKG) was performed which demonstrated perivalvular/paravalvular leaks,[3] however,

---

1. A disease of her heart valve that would require mitral valve replacement surgery.

2. The destruction of red blood cells.

3. Holes between/within the sewing ring of the prosthetic mitral valve and the tissue to which it was supposed to be sutured.

the cause of the hemolysis was not identified. A blood transfusion was performed in order to attempt to revive the decedent's red blood cells. The decedent was stabilized and sent home approximately a week later.

On August 9, approximately two days after the decedent had been released, Dr. Shaik once again readmitted her to the hospital with symptoms of acute nausea and vomiting, as well as fallen hemoglobin levels and unabated massive hemolysis. Another EKG was performed, and again the presence of continued perivalvular/ paravalvular leaks of the mitral valve prosthesis was revealed. After consultation, the decision was made by the cardiothoracic surgeons who were involved and familiar with the case to perform steroid therapy on the decedent and allow a six- to eight-week period of endothelialization[4] while conservatively monitoring the decedent.[5] Toward the end of August, the decedent's condition had further deteriorated. Dr. Shaffer recognized that the leaks had not healed through endothelialization, and that replacement of the mitral valve was necessary.

Dr. Shaffer began the second valve operation on September 3, 1996, but made the decision to abandon the procedure before its completion due to a massive hemorrhage resulting from the patient's dense scar tissue. Subsequently, the decedent remained in the hospital

---

4. A natural tissue growth over the area of a mechanical heart valve's exposed sewing ring.

5. A treatment plan approved and agreed upon by the four heart surgeons affiliated with Dr. Shaffer's group, the independent second opinion from the cardiothoracic surgeon consultation (with Dr. Keagy), and the valve manufacturer.

where she continued to deteriorate, developed multi-organ failure, and died on September 14, 1996.

A jury trial was held from November 15-19, 2004. The jury returned a verdict in favor of the defendants. (N.T. 1241-42.) On November 29, 2004, plaintiffs filed a timely motion for post-trial relief pursuant to Pa.R.C.P. 227.1. Defendants filed a response on December 8, 2004. Upon review of the transcript, the plaintiffs withdrew two of their claims of trial error, and, thereafter, the plaintiffs filed the present post-trial motion on May 6, 2005, requesting a new trial as to the aforementioned issues. Defendants subsequently filed a brief in opposition to the plaintiffs' post-trial motion.

The decision to order a new trial is one that lies within the discretion of the trial court. *Coker v. S.M. Flickinger Company Inc.,* 533 Pa. 441, 451, 625 A.2d 1181, 1186 (1993). There are two levels to a trial court's decision as to whether to grant a new trial. First, the court must determine whether a mistake was made at trial. This decision may involve factual, legal, or discretionary matters. The court must then determine whether the mistake constitutes a sufficient basis for granting a new trial. This is always a discretionary matter because it requires consideration of the particular facts and circumstances surrounding the case. *Morrison v. Commonwealth, Department of Public Welfare, Office of Mental Health (Woodville State Hospital),* 538 Pa. 122, 646 A.2d 565 (1994). Courts have routinely granted new trials where the verdict is against the weight of the evidence, "when the jury's verdict is contrary to the evidence as to shock one's sense of justice, and the award of a new trial is

imperative so that right may be given another opportunity to prevail." *Thompson v. City of Philadelphia,* 507 Pa. 592, 598, 493 A.2d 669, 672 (1985).

## TWO SCHOOLS OF THOUGHT

Plaintiffs' first contention is that the "two schools of thought" doctrine is inapplicable here, due to a lack of a consensus regarding the decedent's diagnosis.

In *Jones v. Chidester,* 531 Pa. 31, 610 A.2d 964 (1992), the Pennsylvania Supreme Court set forth the requirements of the "two schools of thought" doctrine. The court found that "[w]here competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of recognized and respected professionals in his given area of expertise." *Id.* at 40, 610 A.2d at 969. Instead of placing a numerical value on what constituted a considerable number, the court required only that the defendant provide an expert witness who could give factual reasons to illustrate that a considerable number of professionals agreed with the treatment employed by the defendant. Once the above requirement was met, a jury instruction would be warranted and the burden would then be placed on the jury to decide if two legitimate schools of thought existed that would bar the defendant from liability. *Id.*

Plaintiffs contend that this court erred by instructing the jury on the "two schools of thought" doctrine. They argue that no consensus existed regarding the diagnosis of the decedent and therefore, according *Choma v. Iyer,* 871 A.2d 238 (Pa. Super. 2005), the "two schools of

thought" doctrine is inapplicable. In *Choma,* the court held the doctrine to be inapplicable where the expert witnesses disagreed over the degree to which plaintiff was overweight. The court stated that, where medical experts in a case agree as to the recognized and established proper treatment for a particular type of injury but there is a dispute as to whether the plaintiff had that type of injury, the latter question is one of fact for the jury. *Id.* citing *Hodgson v. Bigelow,* 335 Pa. 497, 7 A.2d 338 (1939).

However, unlike *Choma,* both plaintiffs' and defendants' experts agreed with Dr. Shaffer that the decedent was suffering from hemolysis and had a perivalvular leak. Plaintiffs' expert testified that the decedent was suffering from hemolysis caused by a perivalvular leak. (N.T. 225.) Further, on cross-examination, plaintiffs' expert testified that he believed Dr. Shaffer was aware that a small or mild perivavular leak could result in massive hemolysis. (N.T. 331.) Similarly, defense expert Bradley Levin testified that Dr. Shaffer made the correct diagnosis. However, Dr. Levin further testified that in his opinion this was a case of treatment and not diagnosis. (N.T. 1065.)

Additionally, unlike *Choma,* a dispute did arise regarding the proper treatment of the decedent's hemolysis. Plaintiffs' expert Dr. Bojar testified that another operation was needed to repair the decedent's artificial valve (N.T. 227-28.) Conversely, defendants' expert Dr. Levin opinioned that endothelialization was the proper procedure. (N.T. 844.) Therefore, since a dispute did not arise regarding the decedent's condition but rather the treatment of that condition, this court finds that the "two schools of thought" doctrine is applicable.

Alternatively, plaintiffs argue that defendants failed to meet their burden of proving that its "school of thought" was a course of treatment advocated by a considerable number of medical professionals in the area of the defendant doctor's expertise. Plaintiffs cite *Tesauro v. Perrige,* 437 Pa. Super. 620, 650 A.2d 1079 (1994), where the court found that the writings and teachings of one individual were insufficient to establish that a considerable number of professionals agree with the advocated treatment.

However, in *Gala v. Hamilton,* 552 Pa. 466, 715 A.2d 1108 (1998), the court clarified *Tesauro* and found that it did not stand for the proposition that medical literature was required to establish factual support for the advocated school of thought. The court in *Gala* found that a requirement of medical literature would be contrary to the finding in *Jones,* that the burden on defendant "should not prove burdensome." *Id.,* 552 Pa. at 479, 715 A.2d at 1115, *Jones* at 40, 610 A.2d at 969. The *Gala* court found that a jury instruction on the "two schools of thought" doctrine was warranted after "the testimony of expert witnesses alone establishes that a considerable number of recognized and respected professionals advocate the course of treatment [advocated] by defendant." *Gala,* 552 Pa. at 479, 715 A.2d at 1114. The court found that, after defendant had provided this expert testimony, plaintiff was free to challenge the basis of the expert's testimony on cross-examination. *Id.*

In the instant case, this court finds that defendants satisfied their burden by providing an expert witness who gave factual reasons to support that a considerable num-

ber of professionals agreed with defendants' method of treatment. Defendants' expert witness Dr. Levin, who performed 300 to 400 surgeries similar to the one performed on the decedent, testified that, in the vast majority of cases, endothelialization would correct the leak and solve the problem. (N.T. 876.) Dr. Levin buttressed this point by giving examples of the medical literature that supported Dr. Shaffer's course of treatment. (N.T. 877-79, 885-87.) One example in particular, from the *Journal of the American College of Cardiology*, found that, following a study of 113 patients with a leak similar to that found in the decedent, 56 had leaks that healed themselves over a six-week time span.

Support for defendants' course of treatment is also found in the consensus that existed between defendant, Dr. Shaffer, and Dr. Gregory Keagy, a local heart surgeon affiliated with another practice group who was consulted by Dr. Shaffer to assist in her decision to pursue endothelialization as a course of treatment for the decedent. In a letter to Dr. Shaffer, Dr. Keagy stated that he "would agree with your course of observation and waiting till more time has elapsed since OR to see if patient hemolytic—hemolysis is decreasing."

Therefore, this court finds that the defendants clearly met their burden of establishing that another school of thought existed which was supported by a considerable number of recognized and respected professionals in the given area of expertise who would have followed the same course of treatment. Consequently, since defendants met this burden, the instruction on the "two schools of thought" doctrine was warranted.

## *FRYE* MOTION

Plaintiffs argue that this court improperly denied their *Frye* motion and, therefore, the testimony of the defendants' sole expert Dr. Levin was improperly permitted. Plaintiffs contend this testimony was highly prejudicial and directly resulted in a verdict for the defendants.

The admission of expert testimony in Pennsylvania is governed by Pa.R.E. 702, which embodies *Frye* and reads:

"If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

*Frye* explains that "while the courts will go a long way in admitting expert testimony, deduced from a well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).

Prior to the commencement of trial, plaintiffs sought by written motion to preclude testimony of defense expert Dr. Levin on the grounds that it was prohibited under *Frye*. Plaintiffs' specific objection arose from the theory that endothelialization over a six-week period could seal a perivalvular leak. Before this expert took the stand, a side-bar discussion ensued and the motion was denied. (N.T. 1088-92.)

Plaintiffs argue that similar to *Grady v. Frito-Lay Inc.,* 576 Pa. 574, 839 A.2d 1038 (2003), because Dr. Levin's theory regarding endothelialization was never generally accepted by respected members of the field of cardio-thoracic surgery, the jury's acceptance of his testimony as scientific/medical fact rendered its verdict untrustwor-thy. This argument is without merit.

In *Grady,* plaintiff's expert, a chemical engineer, sought to testify as to the danger of Doritos® brand chips and their inability to be safely swallowed. The trial court ruled that the expert did not satisfy the *Frye* test, how-ever, the appellate court disagreed and reversed. The Supreme Court ultimately reinforced *Frye* as the stan-dard for expert evidence in Pennsylvania. However, the court reversed in part, determining that the exclusion of evidence was not an abuse of discretion because of the failure to establish that the standard methodology used in reaching the said conclusion was generally accepted by scientists in the relevant field.

This case is distinguishable from *Grady* because Dr. Levin's expert testimony did in fact comport with the *Frye* test for admissibility by being demonstrated as gen-erally accepted within the scientific/medical community. Dr. Levin testified as to the methodology for allowing a leak to heal itself through endothelialization versus re-placement, and the significant decrease in hemolytic symptoms to shortly follow, and factually proved that doctors in the field of cardiothoracic surgery generally accepted this methodology. This was buttressed by the testimony of the four doctors at Shaffer Cardiovascular, the independent second opinion given by Dr. Keagy, the

recommendation of the valve manufacturer, and the medical articles used by Dr. Levin in his testimony.

Moreover, *Grady* further clarifies that whether a witness is qualified to render opinions, and whether his testimony passes the *Frye* test for admission of expert scientific evidence, are two distinct inquiries that must be raised and developed separately by the parties, and ruled upon separately by the trial courts. *Grady v. Frito-Lay Inc.,* 576 Pa. 574, 839 A.2d at 1045-46 (2003). In this case, the plaintiffs are not challenging Dr. Levin's qualifications as an expert witness, but whether his testimony passed the *Frye* test for admission of the expert scientific evidence that he rendered at trial.

Additionally, plaintiffs contend that this court abused its discretion by admitting this evidence in view of the fact that no valid scientific or medical evidence or literature was produced at trial establishing that this proposed course of action was generally accepted in the scientific/ medical community, and maintain that a new trial must be awarded.

Plaintiffs' argument that defendants' failure to produce any scientific or medical literature proves that this theory was not generally accepted in the scientific community is erroneous. Factual support for the "two schools of thought" instruction need not be in the form of medical literature, rather, it may be testimonial. *Gala v. Hamilton,* 552 Pa. 466, 715 A.2d 1108 (1998). The jury, however, may take into consideration the lack of medical literature supporting an expert's position, when evaluating the information to render a verdict. *Id.* at 479, 715 A.2d at 1115.

Awarding a new trial based upon plaintiffs' argument would be inappropriate. The decision to grant a new trial grounded on the improper admittance of expert testimony is reviewed under an abuse of discretion standard. *Grady v. Frito-Lay Inc.,* 576 Pa. 574, 839 A.2d 1038 (2003). "An abuse of discretion . . . requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." *Id.,* 839 A.2d at 1046, citing *Paden v. Baker Concrete Construction Inc.,* 540 Pa. 409, 414, 658 A.2d 341, 344 (1995). Absent a clear abuse of discretion or error of law, a trial court's decision regarding expert testimony will be upheld. *Thomas v. West Bend Company Inc.,* 760 A.2d 1174 (Pa. Super. 2000).

Finally, plaintiffs argue that, since the admission of expert testimony was improper, the "two schools of thought" doctrine that was improperly presented directly led to a verdict for the defendants. Since "two schools of thought" was not on the verdict slip, plaintiffs cannot establish that this doctrine had a direct effect on the verdict. (See verdict slip, Nov. 19, 2004.) The jury's decision may have rested upon the plaintiffs' failure to meet their burden of proof with regard to negligence, and not the alternative school of thought presented by the defendants. Therefore this court properly denied the plaintiffs' *Frye* motion.

Accordingly, the following is entered:

ORDER

And now, October 18, 2005, it is hereby ordered that plaintiffs' motion for post-trial relief is denied.