Diana K. BETZ, Executrix of the
Estate of Charles Simikian,
Deceased, Appellant

v.

PNEUMO ABEX LLC, successor-in-interest to Abex Corporation, Allied Signal, Inc., in its own right and as successor-in-interest to Allied Corporation, successor-in-interest to Bendix Corporation, Borg–Warner Corporation, Carlisle Companies, Inc., Okonite Company, General Motors Corporation, Kelsey–Hayes Company, Metropolitan Life Insurance Company, a/k/a Metropolitan Insurance Company, DaimlerChrysler Corporation, f/k/a Chrysler Corporation, Ford Motor Company, Volkswagen of America, Inc., Napa Automotive Parts Group, Rohrich Cadillac, Inc., Dyke Motor Supply Company Incorporated, South Hills Auto Parts Co., Appellees.

Superior Court of Pennsylvania.

Argued Feb. 12, 2009.
Filed April 30, 2010.

David B. Rodes, Pittsburgh, for appellant.

Peter J. Neeson, Philadelphia, for Allied, appellee.

Sharon L. Caffrey, Philadelphia, for Ford Motor, appellee.

Robert L. Byer, Pittsburgh, for General Motors, appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, ORIE MELVIN *, LALLY–GREEN *, KLEIN *, BOWES, PANELLA, DONOHUE and SHOGAN, JJ.

OPINION BY DONOHUE, J.:

¶ 1 Appellant, Diana K. Betz ("Betz"), Executrix of the estate of Charles Simikian ("Simikian"), appeals from the trial court's final order entered May 10, 2006, disposing of all claims in, and dismissing all parties to, this action.[1] This final order followed the trial court's grant of summary judgment to Appellees Allied Signal, Inc. ("Allied Signal"), Ford Motor Company ("Ford"), General Motors Corporation ("GMC"), and DaimlerChrysler Corporation, f/k/a Chrysler Corporation ("Chrysler"), (collectively, the "Friction Product Defendants"[2]). As noted *infra*, Simikian, a victim of mesothelioma, was a

---

* Judge Orie Melvin did not participate in the consideration or decision of this case.

* Judge Lally–Green did not participate in the consideration or decision of this case.

* Judge Klein did not participate in the consideration or decision of this case.

1. The final order entered on May 10, 2006 disposed of "all claims in, and all parties to, this action...." The final order was amended on May 30, 2006 to dismiss with prejudice all claims against South Hills Parts Company and Metropolitan Life Insurance Company.

2. Other than Allied Signal, Ford, GMC, and Chrysler, all other parties in the action below filed notices of no interest and are thus not parties to this appeal.

On or about June 1, 2009, GMC and Chrysler filed petitions for bankruptcy. This Court initially dismissed the appeal without prejudice to reinstate the appeal at such time as the automatic stay pursuant to the Bankruptcy Code was no longer in effect. On August 10, 2009, this Court reinstated the appeal with respect to all non-bankruptcy parties and severed the bankrupt parties from the appeal in accordance with *DiDio v. Philadelphia Asbes-*

forty-four (44) year veteran of the automotive repair industry. The grant of summary judgment was based upon the trial court's earlier grant of a defense "global" *Frye* motion to exclude any and all expert testimony asserting that a plaintiff contracted an asbestos-related disease as a result of exposures resulting from work in the automotive repair field. For the reasons set forth herein, we conclude that the trial court erred in granting summary judgment to the Friction Product Defendants. We so conclude because the trial court, in granting the *Frye* motion, based its decision neither on a "scientific" theory advanced by the Friction Product Defendants nor evidence of record. Accordingly, we reverse and remand for further proceedings consistent with this decision.

¶ 2 On February 24, 2005, Simikian filed a complaint in the Court of Common Pleas of Allegheny County against various manufacturers and suppliers of automotive friction products containing asbestos. After his more than forty year career as an automobile mechanic, Simikian was diagnosed with mesothelioma in January 2005. Complaint at ¶ 17. In his complaint, Simi-

kian alleged that the inhalation of asbestos from automotive friction products over time, including "brakes, clutches and other parts of vehicles," caused his illness.[3] *Id.* at ¶ 17–18. Simikian died shortly after the filing of his complaint, and on October 19, 2005, an amended complaint was filed to reflect Betz's role as the executrix of his estate.

¶ 3 On March 18, 2005, Chrysler and Volkswagen of America, Inc.[4] ("Volkswagen") filed a "Global *Frye* Motion to Preclude Plaintiffs from Introducing Any Evidence That Exposure to Friction Products Causes Asbestos Disease in Vehicle Mechanics and Request for Global *Frye* Hearing Pursuant to Rule 207.1." This "global motion" purported to apply to all cases pending in Allegheny County in which plaintiffs or their decedents alleged to have contracted an asbestos-related disease (including mesothelioma, asbestosis, or lung cancer) as a result of exposure to asbestos-containing "friction products," including brakes and clutches.[5] Global *Frye* Motion at ¶ 1. In the motion, the Friction Product Defendants argued that no epidemiological studies[6] exist to support the contention

---

*tos Corp.*, 434 Pa.Super. 191, 642 A.2d 1088 (1994), *overruled on other grounds, Cleveland v. Johns–Manville Corp.*, 547 Pa. 402, 690 A.2d 1146 (1997).

Accordingly, herein the term "Friction Product Defendants" shall refer only to Allied Signal and Ford.

**3.** Between 80% to 94% of all mesotheliomas are caused by exposure to asbestos. Trial Court Opinion, 8/17/06, at 23 n.23. Other known causes include high levels of radiation exposure. *Id.* at 22 n.21. Some percentage of mesotheliomas are idiopathic (without an attributable cause). *Id.* at 22–23.

**4.** The trial court subsequently dismissed Volkswagen from the case. In the trial court, Chrysler and Volkswagen were the lead defendants who filed and litigated the *Frye* motion that is the subject of this appeal. Allied Signal joined in the *Frye* motion, while Ford

filed a motion for summary judgment after it was granted by the trial court. To avoid confusion, the participants in the *Frye* motion proceedings shall be referred to as the "Friction Product Defendants."

**5.** In response to the request for a "global" order, the trial court initially indicated that "I don't think I can do that." N.T., 6/23/05, at 12. Subsequently, however, the trial court agreed that it intended "to make a rule [sic] does brake exposure cause asbestos-related diseases once and for all." N.T., 8/17/05, at 51.

**6.** Epidemiology involves the study of the incidence of disease in various populations by determining if there is a statistical association between a disease and a factor suspected of causing that disease. *Blum by Blum v. Merrell Dow Pharmaceuticals, Inc.*, 705 A.2d

that "exposure to friction products as part of one's total, cumulative lifetime exposure to asbestos" is a significant contributing factor in the development of asbestos-related diseases, and that instead expert witnesses testifying on behalf of plaintiffs offer only insufficient "case studies" in support of a cause and effect relationship between exposure to asbestos and asbestos-related disease. *Id.* at ¶ 7. The global motion further alleged that epidemiological studies (some of which were attached as exhibits) conclusively demonstrate that exposure to asbestos from friction products does not place "a vehicle mechanic at any increased risk for the development of asbestos-related disease." *Id.* at ¶ 3–4. The global motion concluded that expert testimony attempting to establish a causal link between exposure to asbestos from friction products is novel science because it "[flies] in the face of every epidemiological study on point," and should therefore be deemed inadmissible at trial pursuant to *Frye v. U.S.*, 293 F. 1013 (D.C.Cir.1923), as adopted in Pennsylvania. *Id.* at ¶ 7–12.

¶ 4 After hearing argument from counsel, the trial court issued an order denying the global *Frye* motion, but granted the Friction Product Defendants leave to refile "specifically identifying the precise relief sought, and specifically identifying the precise method utilized by the Plaintiffs' expert that is being challenged by the *Frye* motion." Order, 4/26/05. The trial court's order further provided that the revised motion "should also reference and/or attach authorities in support of the Movant's *prima facie* allegation that the methodology utilized by the Plaintiffs' expert

fails to satisfy the requirements of *Frye.*" *Id.*

¶ 5 In accordance with the trial court's order, on June 3, 2005 the Friction Product Defendants amended their global *Frye* motion. In addition to the references to "case reports" in the original motion, the Friction Product Defendants identified a number of other methodologies deemed inadequate in light of epidemiological evidence, including, *inter alia:* chemical structure analysis, *in vitro* or *in vivo* animal studies, reliance on non-peer reviewed studies, and extrapolation. Amended Global *Frye* Motion at ¶ 10. Attached to the amended motion were the same epidemiological studies attached to the original motion as well as a letter to the trial court from defense experts "with considerable experience in the field of epidemiology and/or risk assessment," explaining the unreliability of case reports in relation to epidemiological studies. As did the original motion which argued the preclusive effect of epidemiological evidence over all methodologies reaching a different conclusion, the amended motion concluded that "epidemiological studies are the most useful and conclusive type of evidence to prove causation." Further, "when there is sound analytic epidemiology establishing a proposition, to use any other methodology to reach a contrary proposition is not only novel, it is scientifically unsound, and not an accepted practice in the scientific community." *Id.* at 5.

¶ 6 In response to the amended global *Frye* motion, on June 23, 2005 the trial court conducted a status conference at which time further argument from counsel was considered. At the conclusion of the status conference, the trial court instructed the parties to designate "representative

1314, 1323–24 (Pa.Super.1997) ("Epidemiology deals with population samples and seeks to generalize those results; it goes from the specific, *i.e.*, a sample, to the general, *i.e.*, a population."), *affirmed*, 564 Pa. 3, 764 A.2d 1 (2000).

cases" that "embrace[ ] as many different issues as might arise within the context of asbestos litigation against friction products...." Notes of Testimony ("N.T."), 6/23/05, at 11, 25–27; Order, 6/23/05. In accordance with the trial court's instruction, on July 20, 2005 the parties mutually agreed to designate four representative cases for a *Frye* evidentiary hearing pursuant to Pa.R.C.P. 207.1. Betz's case was one of the four cases so designated.[7]

¶ 7 The June 23, 2005 order also scheduled a *Frye* evidentiary hearing for October 2005, and in connection therewith ordered counsel for plaintiffs in the designated cases to "identify witnesses and file expert reports regarding the proximate causal relationship between exposure to friction products and the development of the Plaintiffs' disease process." Order, 6/23/05. In response, on August 8, 2005, plaintiffs in the designated cases collectively submitted the expert report of John C. Maddox, M.D. ("Dr. Maddox").[8] In his written report, Dr. Maddox opined that, *inter alia*, the great majority of mesotheliomas are caused by exposure to asbestos, that all types of asbestos can contribute to the development of malignant mesothelioma, that each and every exposure to asbestos contributes to the development of mesothelioma in a cumulative and dose-related manner, and that low-dose exposure to asbestos is sufficient to cause mesothelioma. Affidavit of John C. Maddox, M.D., 7/4/05, at 1.

¶ 8 On August 17, 2005, the trial court heard argument from counsel on the issue of the alleged novelty of Dr. Maddox's opinions. Counsel for plaintiffs argued that Dr. Maddox's methodologies and opinions have been routinely provided by medical experts in Pennsylvania courts for many years, while counsel for the Friction Product Defendants relied on the preclusive effect of the epidemiological studies to insist on the novelty of his opinions. At the conclusion of that hearing, the trial court made an initial decision that the offered opinions were novel, but not on the basis of the epidemiological studies advanced by the Friction Product Defendants:

> Largely what [Dr. Maddox] says I don't find to be particularly novel. The vast majority of what he says seems to be based in long-standing traditional scientific principles, understood quantities and characteristics of asbestos generally, but that portion of what he says relates only to sort of the general risks associated with asbestos. *Where [Dr. Maddox's] opinion becomes, arguably, and I think perhaps ultimately, novel in that it is a new, original or striking*

7. For purposes of the evidentiary hearing, the trial court required the parties to stipulate to a set of facts for each case. In the *Betz* case, the parties stipulated that Simikian worked as an auto mechanic for at least 44 years (1946–1950, 1951–1953, 1953–1957, and 1957–1989), that during this time period he worked with and around automotive friction products, and that he contracted mesothelioma. Proposed Stipulations of Facts, 10/15/05, at 1.

8. Plaintiffs also submitted the expert report of David Laman, M.D. ("Dr. Laman"), a pulmonologist, which is very similar to that submitted by Dr. Maddox with respect to methodology. Because Dr. Laman's report deals mostly with the connection between exposure to asbestos and lung cancer, counsel for Betz has not challenged the exclusion of his report in this appeal. Brief for Appellant, at 9 n.4. In his oral testimony at the evidentiary hearing, however, Dr. Laman also testified in some respects about causal connections between exposure to asbestos and mesothelioma, and the trial court agreed to permit this testimony in the Betz case on the grounds that it went to "[g]eneral acceptance of the methodologies employed by Dr. Maddox." N.T., 10/21/05, at 15. We will consider that testimony for the same purpose in this appeal.

*[sic] is when he attempts to extrapolate down to the position that each and every fiber contributes to the disease process* . . . . Without that statement, I have no causation as to any of the specific plaintiffs. You need that element of [Dr. Maddox's] report to prove causation to each plaintiff. And the reason I think you need it is because his report doesn't specifically rely upon or doesn't reference exposure rates for any specific plaintiff, doesn't specifically rely upon digestive rates or studies from samples taken from the bodies. It is not case specific in any regard.

\* \* \*

*And the reason I find it to be, perhaps, novel is because it relies upon purely the idea that mesothelioma caused by asbestos is a dose-response disease. But all the literature relied upon by [Dr. Maddox] ... deal with where there is an exposure of a known quantity, of a significant quantity* . . . . *So the question of whether you can extrapolate down is not, in my judgment at the present moment and my understanding of the science or what [Dr. Maddox] relies upon, is not an absolute or a given or something of the sort commonsensically understood.* I don't see that he relies upon or references any scientific authority or any medical authority for his doing so.

N.T., 8/17/05, at 105–08 (emphasis added).

¶ 9 Based on its conclusion that Dr. Maddox's methodology using extrapolation from dose response principles was not "commonsensical," the trial court conducted its *Frye* evidentiary hearing on October 17–21, 2005.[9] At the hearing, Dr. Maddox testified that the cumulative nature of asbestos exposures causes disease:

Q. Now, doctor, do you have an opinion with reasonable medical certainty whether or not it is the total and cumulative exposure that causes mesothelioma, lung cancer, and asbestosis?

A. Yes, I do. In my opinion, it is the total and cumulative exposure that should be considered for causation purposes.

\* \* \*

Q. Doctor, do you have an opinion with reasonable medical certainty whether it's every exposure to asbestos that contributes to the risk and, also the cause of someone developing mesothelioma or lung cancer.

A. Yes, I do.

Q. What is that opinion?

A. I believe that it's each and every exposure that contributes to the development of mesothelioma and lung cancer.

N.T., 10/17/05, at 80–81, 87.

¶ 10 Dr. Maddox testified within a reasonable degree of medical certainty that he believed he utilized a "generally-accepted methodology" in reaching his conclusion that exposure to asbestos fibers by automobile mechanics causes mesothelioma. *Id.* at 28. He described the cumulative effect of this methodology as "a matter of small bridges": "from chrysotile[10] is carcinogenic, to the product containing chrysotile, the product releasing chrysotile, and people developing tumors." *Id.* at 103.

9. The trial court also accepted additional evidence, including submitted deposition testimony, in December 2005.

10. Chrysotile asbestos fibers are found in the linings of many brakes and are emitted as a dust into the air when an automobile mechanic grinds and sands the linings while servicing the brakes during repair work (including replacement). N.T., 10/17/05, at 70, 89.

He based his opinion regarding these "bridges" on a methodology that included a reliance on, *inter alia:* (1) medical articles concluding that chrysotile fibers (the type most frequently found in friction products) cause mesothelioma, *id.* at 71, (2) medical reports finding chrysotile fibers in the lungs of brake mechanics who developed mesothelioma, *id.* at 73, (3) medical articles reporting that asbestos fibers of less than five microns in length can cause mesothelioma, *id.* at 26, (4) medical literature reporting that exposure levels consistent with those experienced by brake mechanics can cause mesothelioma, *id.* at 81–82, (5) animal and in-vitro studies demonstrating increased incidence of tumors at higher doses of asbestos exposures, *id.* at 85, (6) case reports of brake mechanics developing mesothelioma, *id.* at 105, (7) microphotographs showing that chrysotile fibers are loose and capable of release during the grinding of brakes, *id.* at 158, (8) review of epidemiology studies that he found to be inconclusive, *id.* at 27–28, (9) the "Helsinki Criteria," which include findings that mesothelioma may be caused by brief or low-level occupational exposure to asbestos,[11] and (10) review of findings of the EPA and other United States government agencies (*e.g.,* OSHA, NIOSH, National Academy of Sciences), and by other countries and international organizations, (*e.g.,* the World Trade Organization, the World Health Organization) concluding that brake mechanics exposed to asbestos can develop mesothelioma, *id.* at 69, 72, 102. In response to cross-examination and questions by the trial court, Dr. Maddox agreed that he was not familiar with Simikian's exposure history to asbestos, and would offer a favorable opinion regarding causation for any plaintiff with any level of occupational exposure to asbestos. *Id.* at 61–64, 145.

¶ 11 The plaintiffs also called Dr. Laman, a physician board-certified in internal medicine, pulmonary diseases, and critical care medicine, and offered his testimony on the methodology employed to conclude that exposure to asbestos from friction brake products causes asbestos-related diseases, and on the general acceptance of that methodology in the relevant scientific community. N.T., 10/21/05, at 5, 15. Dr. Laman offered testimony consistent with that of Dr. Maddox, including that even brief exposures to asbestos can cause mesothelioma, and that "the total and cumulative exposure to asbestos causes mesothelioma." *Id.* at 10, 17. Dr. Laman relied on many of the same sources as did Dr. Maddox, and testified within a reasonable degree of medical certainty that his methodology, like Dr. Maddox's, "is a generally-accepted methodology used by physicians in clinical practice every day." *Id.* at 39. He also indicated that while epidemiological studies have some value in "looking at the cause and effect relationships between large groups of patients to see what the outcome is," with a specific individual, "one needs to look at the global data and not just the specific epidemiological data." *Id.* at 40. Regardless of epide-

11. Dr. Maddox explained that the "Helsinki Criteria" are findings of a consensus conference on the causes of mesothelioma and other asbestos-related diseases in Helsinki, Finland in January 1997. T he purpose of the conference, which was attended by 19 participants from eight countries that do not produce asbestos, was to "formulate[] criteria for considering whether individual diseases were related to or caused by asbestos in a given individual. *Id.* at 84. The Helsinki Criteria findings included the identification of causation markers of asbestos-related disease in mesothelioma patients where there is evidence of asbestos exposure from **either** (1) slides of a victim's lungs, (2) a fiber burden analysis, or (3) occupational history. *Girty-Risk v. Pneumo Abex Corporation,* GD No. 04–2043 (Court of Common Pleas of Allegheny County, Pennsylvania), at 101.

.miological data, when the agent involved is a "known carcinogen which has been demonstrated to be causative of cancers in multiple other circumstances," it is "common clinical practice to ascribe specific causation to specific agents." *Id.*

¶ 12 In response, the Friction Product Defendants called or submitted deposition testimony of several epidemiologists to testify that epidemiological studies have failed to support the conclusion that exposure to asbestos through automotive repair work causes mesothelioma. One of these witnesses, Dr. Jane Teta ("Dr. Teta"), an epidemiologist, testified that in 2003 she and other researchers [12] performed a "meta-analysis" of previously performed epidemiological studies, which collectively arrive at the conclusion that automotive repair work does not cause mesothelioma. N.T., 10/18/05, at 28–51. According to Dr. Teta, by analyzing multiple studies together, "you no longer have the precision problem," since any particular shortcoming in one report (*e.g.*, data collection and/or analysis) does not exist in others also considered. *Id.* at 31. Dr. Teta also testified that in 2004 she co-authored a study with Dr. Hessel in which they used data from an unrelated prior study conducted by the National Cancer Institute. *Id.* at 158. Drs. Teta and Hessel reconfigured and reevaluated the data, and again arrived at the conclusion that automobile mechanics show no increased risk for contracting mesothelioma.[13] *Id.* at 44

¶ 13 The Friction Product Defendants also offered into evidence the deposition testimony of Victor Roggli, M.D. ("Dr. Roggli"), a pathologist. Dr. Roggli testified that his pathology research shows that although auto mechanics often have above average asbestos content in their lungs, it is typically elevated levels of amphiboles not found in friction products. *Girty–Risk,* GD No. 04–2043 at 142–43. He also testified that based upon his review of the relevant research, he does not believe that there is credible evidence that short asbestos fibers cause disease. *Id.* at 9–11.

¶ 14 On February 27, 2006, the trial court issued an order granting the *Frye* motion. The order precludes the plaintiffs in the four designated cases from introducing any expert testimony that they "contracted any asbestos related disease as a result of automobile brake repair work." Order, 2/27/06, at 1. The trial court's order found that the opinions offered by Drs. Maddox and Laman "are novel and unsupported by generally accepted methodologies within the relevant scientific community." *Id.* The trial court also certified its order for immediate appeal pursuant to 42 Pa.C.S.A. § 702(b), but on or about May 3, 2006 this Court denied the plaintiffs' motions for interlocutory appeal.

¶ 15 The plaintiffs in the designated cases also filed a motion for reconsideration of the grant of the *Frye* motion, and the trial court considered briefs from the parties and oral argument from counsel. On March 30, 2006, the trial court denied the motion for reconsideration, and on April 3, 2006 entered summary judgment

**12.** These researchers included epidemiologists Dr. Michael Goodman ("Dr. Goodman") and Dr. Patrick Hessel ("Dr. Hessel"). Drs. Goodman and Hessel also testified (either at the hearing or by deposition transcript) on behalf of the Friction Product Defendants with respect to the lack of epidemiological studies to support a causal connection between exposure to asbestos by automotive repair workers and the incidence of asbestosis-related diseases.

**13.** On cross-examination, Dr. Teta admitted that funding for both the meta-analysis performed with Drs. Goodman and Hessel, as well as the later study with Dr. Hessel, was provided by Ford, GMC, and Chrysler. *Id.* at 135, 156.

in favor of the Friction Product Defendants based exclusively on the February 27, 2006 order. On May 10, 2006, the trial court entered a final order disposing of all claims in, and dismissing all parties to, the designated cases, thereby making all cases appealable.

¶ 16 On August 17, 2006, the trial court issued a lengthy written opinion in support of its decision to have a *Frye* hearing and to grant the *Frye* motion (and, accordingly, summary judgment). Without a single citation to the voluminous record on appeal, the trial court engaged in an extended discussion of the science of human exposure to asbestos, including ambient air levels, idiopathic incidences of mesothelioma, use of case reports, dose-response curves, and fiber load findings in the biological structures of asbestos-exposed individuals. Trial Court Opinion, 8/17/06, at 6, 8–12, 22–23, 24–25. Based upon its own analysis of the relevant scientific principles involved, the trial court concluded that Dr. Maddox's expert opinion represented only his "best estimate," "gut instinct," and an "educated guess" at causation because he did not employ "methodologies utilizing discrete and specific scientific principles logically applied in a manner that can be affirmatively articulated, referenced, reviewed, and tested, and empirically verified." *Id.* at 4. On the other hand, the trial court made clear that he did not consider *any* of the Friction Product Defendants' epidemiological evidence in reaching its decision, indicating that while such evidence was "academically interesting," it did not "materially support the defendants' *Frye* challenge." *Id.* at 28.

¶ 17 Of the four representative cases designated by the parties for the *Frye* hearing, only Betz has filed an appeal with this Court. Betz raises two issues for this Court's consideration:

1. Whether application of the principle that every exposure to asbestos contributes cumulatively to asbestos disease causation involves a novel scientific methodology?

2. Whether the principle that every exposure to asbestos contributes cumulatively to asbestos disease causation is generally accepted in the fields of pathology and etiology?

Appellant's Brief at 6.

¶ 18 Our scope of review of a trial court's order disposing of a motion for summary judgment is plenary, and we must therefore consider the order in the context of the entire record. *Cassell v. Lancaster Mennonite Conference*, 834 A.2d 1185, 1188 (Pa.Super.2003). Our standard of review is the same as that of the trial court and thus we determine whether the record documents a question of material fact concerning an element of the claim or defense at issue. *Id.* If a question of material fact is apparent, the trial court "must defer the question for consideration of a jury and deny the motion for summary judgment." *Id.* We will reverse the resulting order only where it is established that the court committed an error of law or clearly abused its discretion. *Id.*

¶ 19 Rule 702 of the Pennsylvania Rules of Evidence governs the admissibility of expert testimony on scientific knowledge:

Rule 702. Testimony by experts.

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.[14]

¶ 20 To exclude expert scientific testimony based upon a challenge to the scientific evidence, a party must file a motion pursuant to Rule 207.1 of the Pennsylvania Rules of Civil Procedure, which provides as follows:

Rule 207.1 Motion to Exclude Expert Testimony Which Relies upon Novel Scientific Evidence.

(a) If a party moves the court to exclude expert testimony which relies upon novel scientific evidence, on the basis that it is inadmissible under Pa. R.E. 702 or 703,

(1) the motion shall contain:

(i) the name and credentials of the expert witness whose testimony is sought to be excluded,

(ii) a summary of the expected testimony of the expert witness, specifying with particularity that portion of the testimony of the witness which the moving party seeks to exclude,

(iii) the basis, set forth with specificity, for excluding the evidence,

(iv) the evidence upon which the moving party relies, and

(v) copies of all relevant curriculum vitae and expert reports;

(2) any other party need not respond to the motion unless ordered by the court;

(3) the court shall initially review the motion to determine if, in the interest of justice, the matter should be addressed prior to trial. The court, without further proceedings, may determine that any issue of admissibility of expert testimony be deferred until trial; and

(4) the court shall require that a response be filed if it determines that the matter should be addressed prior to trial.

(b) A party is not required to raise the issue of the admissibility of testimony of an expert witness prior to trial unless the court orders the party to do so.

Pa.R.C.P. 207.1.

¶ 21 In *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), our Supreme Court adopted the standard originally set forth in *Frye v. U.S.*, 293 F. 1013 (D.C.Cir. 1923), for the admissibility of scientific evidence. In *Frye*, the Court of Appeals for the District of Columbia concluded that scientific evidence may be admitted only if it is generally accepted in the relevant scientific community:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established

14. Under Rule 702, the *Frye* requirement is one of several others, including the mandate that scientific evidence be provided by "a witness who is qualified as an expert by knowledge, skill, training or education." Pa. R.E. 702. The Friction Product Brake Defendants have not challenged Dr. Maddox's qualifications. He is a graduate of the University of Virginia School of Medicine with a three year residency in Anatomic Pathology at Stanford University. He is board-certified in anatomical and clinical pathology and hematology, and is a member of the American and Canadian Academy of Pathology, the College of American Pathologists, the Virginia Society for Pathologists, the American Society of Hematologists, and the Pulmonary Pathology Society. N.T., 10/17/05, at 54–59.

to have gained general acceptance in the particular field in which it belongs.

*Frye*, 293 F. at 1014; *Commonwealth v. Nazarovitch*, 496 Pa. 97, 101, 436 A.2d 170, 172 (1981). In *Topa*, the Supreme Court described the *Frye* standard as follows: "Admissibility of the [scientific] evidence depends upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs." *Topa*, 471 Pa. at 231, 369 A.2d at 1281.

¶ 22 In *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038 (2003), our Supreme Court reaffirmed Pennsylvania's continued adherence to the *Frye* test, rather than to the newer federal standard in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Grady*, 576 Pa. at 555–56, 839 A.2d at 1044–45. In *Grady*, the Supreme Court made clear that the *Frye* test "is part of Rule 702," *id.* at 554, 839 A.2d at 1043, and reiterated that "novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Id.* at 555, 839 A.2d at 1043–44. Because *Frye* is an exclusionary rule of evidence, "it must be construed narrowly so as not to impede admissibility of evidence that will aid the trier of fact in the search for truth." *Trach v. Fellin*, 817 A.2d 1102, 1104 (Pa.Super.2003) (*en banc*).

¶ 23 A *Frye* hearing is not appropriate "every time science enters the courtroom." *Commonwealth v. Dengler*, 586 Pa. 54, 69, 890 A.2d 372, 382 (2005). In *Trach*, this Court sitting *en banc* recognized that "our Supreme Court did not intend that trial courts be required to apply the *Frye* standard every time scientific experts are called to render an opinion at trial, a result that is nothing short of Kafkaesque to

contemplate." *Trach*, 817 A.2d at 1110. Instead, we held that "*Frye* only applies to determine if the relevant scientific community has generally accepted the principles and methodology the scientist employs, *not* the conclusions the scientist reaches, before the court may allow the expert to testify."[15] *Id.* at 1112 (emphasis in original). Given this limitation, a subsequent panel of this Court noted that "[n]ot every scientific opinion is either new or original—some are the kind that are offered all the time." *Commonwealth v. Dengler*, 843 A.2d 1241, 1243 (Pa.Super.2004), *affirmed*, 586 Pa. 54, 890 A.2d 372 (2005); *see also Commonwealth v. Whitacre*, 878 A.2d 96, 100 (Pa.Super.2005) (same).

¶ 24 Based upon Rule 207.1 as well as *Grady* and *Trach*, it is clear that a *Frye* motion requires a trial court to engage in a two step process. First, upon the filing of a Rule 207.1 motion, the trial court must determine whether the evidence the moving party seeks to exclude is "novel scientific evidence." To do so, the trial court must consider, *inter alia*, the proffered basis for excluding the evidence and the evidence presented in support of that basis (per Rule 207.1(a)(1)(iii) & (iv)), and decide whether the moving party has demonstrated that there is a legitimate dispute regarding the reliability of the expert's conclusions. If the trial court determines that the Rule 207.1 motion has identified "novel scientific evidence," then it must proceed to the second step, namely to apply the *Frye* standard to decide whether the expert's methodology "has general acceptance in the relevant scientific community." *Grady*, 576 Pa. at 555, 839 A.2d at 1043–44. This two step process ensures that scientific evidence admitted at trial is

15. Where the opposition is to the legitimacy of the expert's conclusions rather than to the novelty of his or her methodology, such a challenge "goes not to admissibility but to weight." *Dengler*, 586 Pa. at 78–79, 890 A.2d at 387 (Baer, J., dissenting).

the product of sound scientific research, but is not "senselessly restrictive" by prohibiting testimony inconsistent with currently prevailing orthodoxy. *See Blum ex rel. Blum v. Merrell Dow Pharmaceuticals, Inc.*, 564 Pa. 3, 9–10, 764 A.2d 1, 5 (2000) (Cappy, C.J., dissenting).

¶ 25 In the amended global *Frye* motion pursuant to Rule 207.1, the Friction Product Defendants argued that any expert witness' conclusion that a plaintiff's asbestos-related disease was caused by exposure to asbestos during his or her work as an automobile mechanic is novel scientific evidence. Amended Global *Frye* Motion at ¶ 15. In support of this contention, the Friction Product Defendants set forth as their basis for the challenge the argument that epidemiological studies have consistently shown no association between work as an automobile mechanic and the contraction of asbestos-related diseases. *Id.* at 11. As evidence for this argument, they attached to their motion copies of several of these epidemiological studies, including the Goodman-Teta-Hessel meta-analysis referenced hereinabove.[16]

¶ 26 On appeal, Betz argues that the trial court erred in finding that Dr. Maddox's conclusion that Simikian's exposure to asbestos as a result of his work as a brake mechanic caused his mesothelioma constituted novel scientific evidence because it is not novel at all. Betz points out that the causal link between work as an automobile mechanic and mesothelioma has been the subject of scholarly articles and studies dating as far back as 1935.[17] N.T., 8/17/05, at 85–88. As Betz notes, the record on appeal also reflects that in 1986 the Environmental Protection Agency published a document entitled "Guidance for Preventing Asbestos Disease Among Auto Mechanics," which concluded that asbestos fibers, including chrysotile fibers found in friction products, causes mesothelioma and other asbestos diseases. *Id.* at 88–90. This publication further noted that mesothelioma "can be caused by very low exposure to asbestos." *Id.* at 89. Finally, Betz also contends that the lack of novelty is demonstrated by the fact that medical professionals routinely offer testimony substantially identical to Dr. Maddox's in this case.[18]

¶ 27 The Friction Product Defendants counter that novelty in this context is not restricted to new science. As this Court made clear in *Trach*, even "bedrock" scien-

---

16. During oral argument before the trial court, counsel for plaintiffs argued that the amended global *Frye* motion filed by the Friction Product Defendants was deficient under Rule 207.1 because it was filed too early. We agree. Rule 207.1, including its subsections 207.1(a)(1)(i) and (v), makes clear that motions should not be filed until after the parties have identified their expert witnesses and expert reports have been filed—which typically does not occur until the time of filing of pretrial statements. Pa.R.C.P. 1041.1 (Asbestos Litigation, Special Provisions) does not suspend Rule 207.1. Because on appeal Betz did not challenge the lack of compliance with the dictates of Rule 207.1, we will not address the implications of this error.

17. Betz also relies on asbestos-disease related cases from this Court in which we found admissible the opinions of expert witnesses that "[e]ach and every breath of asbestos fibers is [a] significant and substantial contributing factor to the [plaintiff's] asbestos related disease." *Smalls v. Pittsburgh–Corning*, 843 A.2d 410, 414 (Pa.Super.2004); *Cauthorn v. Owens Corning Fiberglas Corp.*, 840 A.2d 1028, 1038–39 (Pa.Super.2004); *Lonasco v. A–Best Products Co.*, 757 A.2d 367, 375 (Pa.Super.2000).

18. The record on appeal includes transcripts in at least fifteen Pennsylvania cases in which medical experts have testified that occupational or low-dose exposures to asbestos contribute cumulatively to asbestos-related disease causation.

tific principles may be subject to a *Frye* analysis in certain circumstances:

> We ... are aware that ebb and flow are at the heart of the scientific method: the theory of relativity is only valid until someone disproves it. As the *Frye* court so elegantly stated, however, 'While courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.' *Frye*, 293 F. at 1013. In this single, simple sentence, the *Frye* court recognized that the essence of admissibility is general acceptance: that a principle or discovery can fall by the wayside as science advances is just another way of saying it is not generally accepted. We therefore conclude that we are merely stating the law in Pennsylvania when we state that *Frye* applies only to novel science.

*Trach*, 817 A.2d at 1110; *see also id.* at 1125 ("*Frye* properly governs the admissibility of expert testimony, new or old.") (Klein, J., dissenting); *Dengler*, 586 Pa. at 69–70, 890 A.2d at 382 ("[T]here is some fluidity in the analysis; indeed, science deemed novel at the outset may lose its novelty and become generally accepted in the scientific community at a later date ...").

▮ ¶ 28 This Court's reference in *Trach* to the theory of relativity confirms that any scientific principle, even those once considered unassailable, may be subject to a potential *Frye* challenge as novel scientific evidence if the challenging party demonstrates to the trial court that a legitimate dispute exists among experts in the relevant scientific field regarding the reliability of the expert's conclusions. As such, the mere fact that a scientific principle has been espoused frequently in the past is not determinative regarding whether or not it is "novel" and thus the proper subject of a *Frye* inquiry.

¶ 29 In this regard, the Friction Product Defendants argue that they demonstrated a legitimate dispute regarding Dr. Maddox's opinion that Simikian's work as an automobile mechanic caused his mesothelioma because they offered numerous epidemiological studies that reach conclusions directly contrary to Dr. Maddox's opinion. According to the Friction Product Defendants' expert witnesses, epidemiological studies have uniformly concluded that workers in the field of automotive repair do not show an increased risk for asbestos-related diseases. *See, e.g.*, N.T., 10/18/05, at 50 (Dr. Teta) ("There was consistent evidence of no association in all of the studies we were able to identify."). Identifying reliance on epidemiological evidence as the "gold or litmus test" for causation, the Friction Product Defendants argue that when an expert's causation opinion is contradicted by the conclusions of available existing epidemiological studies, it is *per se* inadmissible under *Frye* and Rules 702 and 703 of the Pennsylvania Rules of Evidence.[19] Amended Global *Frye* Motion, at ¶ 7.

**19.** As explained hereinabove (footnote 13 *supra*), some of these epidemiological studies were funded by Ford, GMC, and Chrysler. In this regard, we note the admonition of then-Justice (now Chief Justice) Castille to be wary of a defendant's "active and deliberate role, motivated by its litigation interests in defending lawsuits ..., in actually creating and influencing the scientific orthodoxy ... through purchased research and the manipulation of 'scientific' literature." *Blum ex rel. Blum v. Merrell Dow Pharmaceuticals, Inc.*, 564 Pa. 3, 13–15, 764 A.2d 1, 5–7 (2000) (Castille, J., dissenting). In *Grady*, Justice Castille further argued that there should be a limited exception from the *Frye* general acceptance rule

¶ 30 Given the evidence relied on by the Friction Product Defendants, the sole question presented to the trial court in the first prong of the Rule 207.1 test was whether the results of the epidemiology studies rebutting Dr. Maddox's causation conclusion allowed a finding that Maddox's opinion that Simikian's mesothelioma was caused by his occupational exposure to asbestos was "novel scientific evidence" and thus subject to a *Frye* hearing. Unfortunately, the trial court did not decide the novelty question based on the motion and accompanying reports and affidavits submitted by the Friction Product Defendants.

¶ 31 Indeed, the trial court did not address the novelty of Dr. Maddox's causation conclusion when addressing the novelty challenge. Instead, the trial court concluded that Dr. Maddox's use of extrapolation, one of the prongs of his overall methodology, was novel: "... where [Dr. Maddox's] opinion becomes, arguably, and ultimately, novel in that it is new, original or striking [sic] is when he attempts to extrapolate down to the position that each and every fiber contributes to the disease process ...". N.T., 8/17/05, at 105. This determination short-circuited the *Frye* motion proceedings and effective appellate review. First, the Friction Product Defendants offered no support in their motion or accompanying reports and affidavits attacking the mechanics of Dr. Maddox's extrapolation technique that would have allowed the trial court to de-

cide that the methodology was novel. Second, the trial court demonstrated a preconceived opinion on the ultimate finding he would need to make in the *Frye* hearings, *i.e.*, whether Betz carried the burden of proving that the methodology utilized by Dr. Maddox to support his causation conclusion was generally accepted in the relevant scientific community. Finally, because the trial court failed to address the adequacy of the epidemiological evidence to establish that Maddox's opinion on the causation of Simikian's mesothelioma was novel, this Court is without the benefit of factual findings by the trial court. For example, the trial court after hearing and/or receiving all of the evidence made no findings regarding the strength of the epidemiological evidence offered by the Friction Product Defendants and its bias or lack thereof. Without the trial court's factual findings in this regard, we cannot opine on whether the epidemiological evidence was sufficient to allow the conclusion that the causation opinion of Dr. Maddox, which has long and often been given by medical experts in the courts of this Commonwealth, is now novel scientific evidence because of the epidemiological studies offered by the Friction Product Defendants.[20]

¶ 32 Although the trial court proceeded to a *Frye* hearing on a faulty finding of novelty of Dr. Maddox's causation opinion, we proceed to review the trial court's ultimate ruling that the methodology used to

when it can be demonstrated that the "scientific orthodoxy" used to establish a lack of general acceptance is "the result of proprietary research influenced by an interested party." *Grady*, 576 Pa. at 562–63, 839 A.2d at 1048 (Castille, J., concurring).

Because it did not rely on Friction Product Defendants' epidemiological studies, however, the trial court made no findings of fact in this regard.

20. In connection with her second issue on appeal, Betz argues that epidemiologists are not competent to address the novelty of opinions or the general acceptance of a method for determining the etiology of a disease because they are not pathologists or medical doctors. Appellant's Brief at 18–19. The trial court did not address this issue, and because our disposition of the case as set forth herein does not require that we do so, we decline to decide this issue in this appeal.

reach the opinion on causation was not generally accepted in the scientific community in order to determine whether the evidence supports the ruling and the preclusion of the causation testimony. We proceed in this fashion because, if any evidence adduced at the *Frye* hearing supports the trial court's ruling that Betz did not meet her burden of proving the general acceptance of the methodology at the foundation of his causation opinion, then we must affirm the trial court. *See, e.g., The Brickman Group, Ltd. v. CGU Insurance Company,* 865 A.2d 918, 928 (Pa.Super.2004) ("We are not bound by the trial court's rationale, and may affirm on any basis.").

¶ 33 After our review of the evidence presented at the *Frye* hearing, we conclude that the trial court abused its discretion in finding, based on its own theories concerning Betz's experts' reliance on extrapolation from dose response relationships, that Dr. Maddox's methodology is not generally accepted in the relevant scientific community. The burden of proof in a *Frye* hearing is on the proponent of the scientific evidence, in this case Betz. *See, e.g., Grady,* 576 Pa. at 558, 839 A.2d at 1045. At the evidentiary hearing, Dr. Maddox testified at length about his methodology, including his reliance on medical articles, reports, and literature concluding that chrysotile asbestos fibers can cause mesothelioma, medical records of brake mechanics with mesothelioma patients with chrysotile fibers in their lungs, case reports, the Helsinki Criteria, animal and *in-vitro* studies, microphotographs, and publications from governmental organizations. N.T., 10/17/05, at 26, 69, 71–73, 81, 85, 102, 105, 158. Both Dr. Maddox and Dr. Laman testified that the methodology employed by Dr. Maddox was generally accepted. N.T., 10/17/05, at 28; N.T., 10/21/05, at 39.

¶ 34 Dr. Maddox further testified that based upon his review, the epidemiological studies proffered by the Friction Product Defendants regarding automobile mechanics are inconclusive and unreliable based upon a lack of sufficiently high population sizes to generate statistically significant results. *Id.* at 132 ("[Causation] cannot be demonstrated by epidemiology, because the technique of epidemiology is just not really appropriate for addressing low dose exposures to chrysotile because of the numbers involved, the large number of people that would be required in order to get a really good statistical number."). In this regard, Betz also introduced the testimony of Dr. Richard A. Lemen ("Dr. Lemen"), an epidemiologist, who testified with regard to the many limitations in the epidemiological studies on automotive mechanics proffered by the Friction Product Defendants, including issues relating to inclusion criteria, problems associated with data collection, and the failure of some studies to take latency into account. *In re: Asbestos Litigation,* No. 77C–ASB–2, Superior Court of Delaware, New Castle Division, 10/18/05, at 55–57. Dr. Lemen concluded that the results of epidemiological studies concerning exposure to brakes and asbestos diseases are equivocal. *Id.* at 96.

¶ 35 The Friction Product Defendants did not respond with any expert testimony that Dr. Maddox's methodology (as described) is not a generally accepted method for evaluating the causes of asbestos-related disease. While they did not have any evidentiary burden to so respond, *Grady,* 576 Pa. at 558, 839 A.2d at 1045, what is telling on the record of this case is that the testimony of various experts called by the Friction Product Defendants tended to support the generally accepted nature of Dr. Maddox's methodology. For example, Dr. Dennis Plaustenbach ("Dr. Plausten-

bach"), a toxicologist, agreed that when making a specific causation determination, a review of the "physical evidence in the body and the work history" of the patient are important considerations. N.T., 10/18/05, at 70 ("[Y]ou have to know the work history."). Dr. Plaustenbach could not (despite the results of epidemiological studies) rule out a finding of causation for a brake mechanic who worked in a small poorly-ventilated room. *Id.* at 117–18. He also testified that United States federal governmental agencies currently unanimously take the position that chrysotile asbestos causes mesothelioma, *id.* at 69, and agreed that the majority of experts believe that chrysotile asbestos causes mesothelioma at adequate doses.[21] *Id.* at 68.

¶ 36 Another of the experts relied upon by the Friction Product Defendants, Dr. Roggli, testified that the Helsinki Criteria, including its findings of causation markers in mesothelioma patients when there is evidence of occupational exposure to asbestos, is "generally accepted." *McIver v. Pneumo Abex Corporation,* A.D. 176–2004 (Court of Common Pleas of Crawford County, Pennsylvania), at 103. And Dr.

Hessel testified that in his professional opinion, mesothelioma cannot be caused by ambient air exposure to asbestos. N.T., 10/21/05, at 38.

¶ 37 Even to the extent that the testimony of experts called by the Friction Product Defendants may be construed as an attack on Dr. Maddox's methodology (because he refused to accord controlling weight to epidemiological evidence), the Friction Product Defendants did not present any evidence of a lack of general acceptance of Dr. Maddox's methodology.[22] Dr. Roggli was the only medical doctor or pathologist whose testimony the Friction Product Defendants introduced at the *Frye* hearing.[23] Dr. Roggli disagreed with the methodology employed by Dr. Maddox, testifying that when formulating opinions regarding causation of asbestos-related disease he recognizes the importance of epidemiological studies in that effort. *Girty–Risk,* GD No. 04–2043, at 135–42. Importantly, however, Dr. Roggli could not testify that the methodology utilized by Dr. Maddox was not generally accepted in the scientific community:

> Q. Do you believe the method, regardless of the fact that you do not accept

21. When asked for criticisms of Dr. Maddox's methodologies *independent* from the proffered epidemiological evidence, Dr. Plaustenbach testified that (1) contrary to U.S. governmental agencies, chrysotile asbestos fibers do not cause *cancer,* and (2) the exposure of automobile repair workers to asbestos is too fleeting to cause mesothelioma. With respect to both issues, they are not criticisms of Dr. Maddox's methodology but rather present issues of fact for the jury to decide. With respect to (1), for instance, Dr. Maddox presented, *inter alia,* medical studies and governmental reports concluding that chrysotile asbestos fibers do cause *mesothelioma.* With respect to (2) Simikian had a forty-four (44) year history of occupational exposure in the automotive repair field. This disagreement with Dr. Plaustenbach presents a classic "battle of the experts" for the jury to decide. It does not present a *Frye* issue.

22. This is interesting since the trial court clearly signaled prior to the *Frye* hearing its skepticism of the extrapolation technique employed by Dr. Maddox.

23. In their appellate briefs, the Friction Product Defendants contend that Dr. Goodman is "a medical doctor who specializes in preventative medicine and epidemiology." Friction Product Defendants' (Chrysler) Brief at 51. In the testimony the Friction Product Defendants introduced into the record in this case, however, Dr. Goodman focused exclusively on his epidemiological work. In fact, Dr. Goodman testified that he is no longer a practicing pediatrician and has "no opinion" or competence to judge the clinical skills or methodologies of a pathologist. *In re: Asbestos Litigation,* C.A. No. 77C–ASB–2, at 71.

them, do you believe they are, that his methods are generally accepted in the scientific community?

[THE WITNESS]: I don't know if that is the case or not. On the—on the one issue of brake dust and mesothelioma, *I don't know if his methodology is accepted by the general scientific community or not.*

*Adams v. Pneumo–Abex Corporation,* No. 7870 of 2002 (Court of Common Pleas of Westmoreland County, Pennsylvania), at 132 (emphasis added).

¶ 38 The epidemiologists called by the Friction Product Defendants criticized Dr. Maddox's methodology for failure to analyze the various epidemiological studies on automobile mechanics or accord them sufficient weight in his "scientific method." N.T., 10/18/05, at 57–58 (Dr. Teta) and 135 (Dr. Hessel). In *Trach,* however, this Court affirmed a trial court's decision permitting expert testimony on causation in the absence of any epidemiological studies supporting an expert's opinion on disease causation. *Trach,* 817 A.2d at 1114. The absence of supporting epidemiological studies is thus not a *sine qua non* to a finding of general acceptance. *Id.; cf. Gala v. Hamilton,* 552 Pa. 466, 478–79, 715 A.2d 1108, 1114 (1998).

¶ 39 The trial court likewise disagreed with the Friction Product Defendants' argument that Dr. Maddox's methodology was not generally accepted because it lacked their epidemiological stamp of approval.[24] The trial court ruled without explanation that it was "simply improper" to attempt to shift the focus from Dr. Maddox's methodology to the results of epidemiological studies. Trial Court Opinion, 8/17/06, at 28–29. The trial court found: "I do not hold that ... the epidemiological evidence offered by the defendants in this case, in any manner, 'trumps' the plaintiff's evidence, or that the plaintiffs are required to proffer epidemiological evidence in support of their medical causation opinion." *Id.*

¶ 40 With regard to Betz' burden of proof, we reiterate that both Dr. Maddox and Dr. Laman testified that the methodology employed by Dr. Maddox was generally accepted. N.T., 10/17/05, at 28; N.T., 10/21/05, at 39; *see Trach,* 817 A.2d at 1114 (a testifying expert may vouch for the general acceptance of his own methodology). In contrast, the only evidence on the record to the contrary was the testimony regarding the primacy of epidemiological evidence offered by Drs. Teta and Hessel, but the trial court properly rejected this evidence as not controlling of the issue of the general acceptance of Dr. Maddox's methodology. In our view, the inquiry should have ended there.

¶ 41 The trial court, however, proceeded to find a lack of general acceptance of Dr. Maddox's methodology based upon reasons never raised by any of the parties to the cases below. To find a lack of general acceptance in Dr. Maddox's methodology, the trial court *sua sponte* engaged in an extended discussion without reference to the record of the science of human exposure to asbestos, including ambient levels of asbestos exposure, idiopathic occurrences of mesothelioma, the use of case reports, dose-response curves, and fiber load findings in the biological structures of asbestos-exposed individuals. Trial Court Opinion, 8/17/06, at 6, 8–12, 22–23, 24–25.

24. *See Cassell v. Lancaster Mennonite Conference,* 834 A.2d 1185, 1190 (Pa.Super.2003) ("[O]ur inquiry does not go to the persuasiveness of Dr. Kay's conclusions; it goes only to whether her methodology enjoys general recognition in her field.... [T]he *Frye* standard [does not] require an optimal methodology, just an accepted one. It is for a jury, and not the trial court, to attach weight to a diagnosis....").

Based upon its own review of its version of the science, the trial court concluded that Dr. Maddox's methodology is not generally accepted because it relies upon the use of extrapolation to arrive at the conclusion that low-dose occupational exposures to asbestos, just like high-dose occupational exposures, may cause mesothelioma.

¶ 42 Specifically, the trial court stated: "I accept that dose response curves for high dose exposure do demonstrate an increased likelihood of disease with an increased dose of asbestos exposure." *Id.* at 13. The trial court also found however, that similar "dose response curves" for lower levels of exposure to asbestos (commonly experienced by automobile mechanics) "simply do not exist," and further questioned how Dr. Maddox could "properly arrive at the conclusion that a dose response curve is applicable to the specific plaintiff before the court." *Id.* at 11–13. As a result, the trial court took issue with Dr. Maddox's extrapolation from the accepted premise that "exposure to large amounts of asbestos can cause disease" to the opinion that "exposure to small amounts of asbestos can cause disease." *Id.* at 13. The trial court described Dr. Maddox's use of extrapolation to be a "simple logical error" and offered his own analogies to explain:

> The fallacy of the 'extrapolation down' argument is plainly illustrated by common sense and common experience. Large amounts of alcohol can intoxicate, larger amounts can kill; a very small amount, however, can do

neither. Large amounts of nitroglycerine or arsenic can injure, larger amounts can kill; small amounts, however, are medicinal. Great volumes of water can be lethal; moderate amounts of water, however, are healthful.

*Id.* at 14. For these reasons, the trial court concluded that Dr. Maddox's methodology was "fundamentally flawed and not generally accepted in the relevant scientific community." *Id.* at 27.

¶ 43 It was improper for the trial court to grant the *Frye* motion based upon arguments never raised by the Friction Product Defendants or supported by any expert witnesses. In *Grady,* our Supreme Court reaffirmed that its continued adherence to the *Frye* test is based upon its interest in having judges "be guided by scientists when assessing the reliability of a scientific method," and not the other way around. *Grady,* 576 Pa. at 557, 839 A.2d at 1044–45. The Supreme Court left no doubt that "requiring judges to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof, as the *Frye* rule requires, is the better way of insuring that reliable expert scientific evidence is admitted at trial." *Id.* at 557, 839 A.2d 1038, 839 A.2d at 1045; *see also Kubacki v. Metropolitan Life Ins. Co.,* 164 A.2d 48, 52 (Pa.Super.1960) (judges "cannot set themselves up as super experts in the field of medicine").[25]

---

**25.** In a footnote to its examples of the "simple logical error" of Dr. Maddox's extrapolation, the trial court indicated that its intention was not to assert that asbestos is "ever medicinal or benign in any quantity," *id.* at 14 n.15, and stated that its only purpose in setting forth the analogies was to criticize Dr. Maddox's use of extrapolation. The trial court did not, however, explain how its analogies constituted fair comparison in light of the acknowledged differences between asbestos (a recognized potent carcinogen) and alcohol, nitroglycerine, and water. In this regard, the trial court's venture into this faulty analysis contravenes the *Grady* court's admonition that judges be guided by scientists and the *Kubacki* court's warning that judges cannot set themselves up as super experts in the field of medicine.

¶ 44 As previously recognized, this court will affirm the trial court if any evidence of record supports its decision. *See, e.g., Brickman,* 865 A.2d at 928. Accordingly, we proceed to review the record for evidence to support the trial court's stated reason for granting the *Frye* motion. Betz argues that the trial court's conclusions regarding the use of extrapolation are not supported by the record on appeal. We agree. After an exhaustive search of a burdensomely extensive record, we have been unsuccessful in finding any record support for the trial court's analysis or conclusions. In its written opinion, the trial court did not include any citations to the record. The Friction Product Defendants likewise offered no help in this regard, since their extensively argued briefs are devoid of any record citations to support the trial court's apparently heartfelt but undocumented criticism regarding the extrapolation technique relied upon by Betz' experts.

¶ 45 Moreover, in *Trach,* this Court sitting *en banc* recognized the use of extrapolation to reach scientific conclusions regarding causation of disease when considering the admissibility of scientific testimony under the *Frye* test. In that case a dentist prescribed an antibiotic for an infection, but a pharmacy assistant at Thrift Drug mistakenly gave Trach capsules of the antidepressant Doxepin. Trach took the recommended dosage as prescribed for the antibiotic, which was more than three times higher than the maximum recommended daily dosage for Doxepin. As a result of this massive overdose, Trach experienced numerous side effects, including persistent cognitive difficulties, cluster headaches, and vision problems (including open-angle glaucoma resulting in a crescent-shaped blind spot in his right eye due to optic nerve damage).

¶ 46 Dr. John Shane ("Dr. Shane"), a board-certified pathologist and toxicologist, testified that all of Trach's cognitive and vision problems were the result of his ingestion of Doxepin. At the time of Dr. Shane's testimony, no studies (epidemiological or otherwise) had ever been performed to determine the effects of a massive dosage of Doxepin in the quantities ingested by Trach, either with respect to the permanent cognitive difficulties or the open-angle glaucoma. As a result, Dr. Shane extrapolated from studies showing that taking Doxepin at the *recommended* dosage may result in temporary cognitive problems and/or closed angle glaucoma. Using these studies on the effects from the recommended dosage of the drug, Dr. Shane testified that a massive overdose may result in permanent (rather than temporary) cognitive problems and open-angle (rather than closed-angle) glaucoma.

¶ 47 On appeal, this Court, *en banc,* began by observing that extrapolation "is not science" but rather "a logical method used 'to estimate the value of a variable outside its tabulated or observed range' or 'to infer (that which is not known) from that which is known.' Webster's 505." *Trach,* 817 A.2d at 1114. "The question then becomes whether extrapolation, although not science, is a methodology generally accepted and used by scientists within the relevant scientific community." *Id.* To answer this question, this Court relied upon a prior decision of the Illinois Supreme Court permitting the admission of extrapolation evidence, in which that court observed that "the method of extrapolation does not concern a technique new to science that may instill a sense of 'false confidence' or carry a misleading sense of scientific 'infallibility.'" *Donaldson v. Central Illinois Public Service Co.,* 199 Ill.2d 63, 86, 262 Ill.Dec. 854, 767 N.E.2d 314, 329 (2002). To the contrary, "[E]xtrapolation by nature admits its fallibility—the

lack of specific support to establish the existence of a known cause and effect relationship." *Id.* at 87, 262 Ill.Dec. 854, 767 N.E.2d at 329.

¶ 48 We also relied upon a decision of the United States District Court for the District of Columbia, *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir. 1984) in which that court likewise admitted extrapolation evidence:

> As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examinations, products liability law does not preclude recovery until a 'statistically significant' number of people have been injured or until science had had the time and resources to complete sophisticated laboratory studies of the chemical. In a courtroom, the test for allowing a plaintiff to recover in a tort suit of this type is not scientific certainty but legal sufficiency; if reasonable jurors *could* conclude from the expert testimony that paraquat more likely than not caused Ferebee's injury, the fact that another jury might reach the same conclusion or that science would require more evidence before conclusively considering the causation question resolved is irrelevant.

*Id.* at 1535–36 (emphasis in original).

¶ 49 Accordingly, in *Trach* this Court concluded that scientists may extrapolate from a "sound scientific basis" when formulating opinions about the etiology of disease, and that in these circumstances the use of extrapolation is "not novel." [26]

We concluded that "[i]t was for the jury, aware of the fallibility of extrapolation, to decide whether Dr. Shane's testimony was credible," and that "it was for Thrift Drug, through vigorous cross-examination, to prove that it was not." *Id.* at 1118–19; *cf. Gala*, 552 Pa. at 479, 715 A.2d at 1114–15 ("Plaintiffs are free to challenge the basis for the expert's testimony on cross-examination, and the lack of medical literature supporting the expert's position may be raised at that time, and duly considered by the jury.").

¶ 50 The trial court found our analysis in *Trach* regarding the use of extrapolation to be inapposite in this case because *Trach* involved "extrapolation up" (extrapolating from the effects resulting from a smaller dose to those resulting from a larger dose) while in this case Dr. Maddox was "extrapolating down" (extrapolating from the effects resulting from a larger dose to those resulting from a smaller dose). In other words, Dr. Shane extrapolated from the adverse effects of a smaller (recommended) dose of Doxepin to the more serious effects of a massive overdose of the drug. In this case, Dr. Maddox is extrapolating from the adverse effects of larger occupational doses of asbestos to the effects of smaller doses of the same carcinogenic fibers (typically experienced by automotive repair workers).

¶ 51 In *Trach*, however, this Court made no distinction between "extrapolation up" and "extrapolation down". To the contrary, in *Ferebee*, one of the cases strongly relied upon by this Court in *Trach*, the

---

**26.** There were two dissenters in *Trach*, the Honorable Judges Klein and Lally–Green, who expressed a preference that the case be remanded to the trial court for a full *Frye* hearing. In *Trach*, the trial court refused to grant a judgment notwithstanding the verdict to the defendants who based that motion on the lack of general acceptance of the methodology used by the plaintiff's expert on causation after verdict. *Trach*, 817 A.2d at 1120 (Klein, J., dissenting). Importantly, however, all nine judges in *Trach*, including Judges Klein and Lally–Green, approved of the use of extrapolation from generally accepted principles in appropriate circumstances. *Id.*

federal district court permitted the introduction of expert testimony using an "extrapolation down" methodology. In that case, a significant amount of evidence existed regarding the acute adverse effects of short-term intense exposure to paraquat, but little or no evidence existed regarding the side effects of low-level exposure over a prolonged period of time. In addressing the use of extrapolation by expert witnesses in that case, the *Ferebee* court (without distinguishing between extrapolation "up" and "down") observed:

> Judges, both trial and appellate, have no special competence to resolve the complex and refractory causal issues raised by the attempt to link low-level exposure to toxic chemicals with human disease. On questions such as these, which stand at the frontier of current medical and epidemiological inquiry, if experts are willing to testify that such a link exists, it is for the jury to decide whether to credit such testimony.

*Ferebee*, 736 F.2d at 1534.

¶ 52 The same basic principle applies in this case. Contrary to the trial court's rather simplistic formulation of his methodology ("if high dose exposure is bad for you, then low-dose exposure . . . must be bad for you too"), Dr. Maddox used a variety of traditional sources (medical literature, animal studies, government reports) to present his opinion that the relationship between exposure to asbestos and the risk of disease is linear—that as the level of exposure increases and the asbestos fibers accumulate in the lungs, the risk of contracting mesothelioma increases proportionally. Utilizing his medical knowledge of the "complex and refractory causal issues" involved, Dr. Maddox opined that this dose-response relationship begins with initial occupational exposures, and mesothelioma does not require the exposure level to cross any (undefined) threshold

before the increase in risk of contracting the disease begins. Based on the record before us, whether or not Dr. Maddox's opinion is persuasive is for the jury, and not the trial court, to decide.

¶ 53 Finally, in supplemental briefs the Friction Product Defendants contend that the Supreme Court's decision in *Gregg v. V-J Auto Parts Company*, 596 Pa. 274, 943 A.2d 216 (2007) compels an affirmance of the trial court's decision in this case. In *Gregg*, the Supreme Court described the proper application of the "regularity, frequency and proximity" test when deciding product identification motions for summary judgment in asbestos-related cases. It modified the law previously established in this area by this Court in *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50, *appeal denied*, 520 Pa. 605, 553 A.2d 968 (1988). The Supreme Court adopted a flexible, case-by-case approach in which trial courts must make a reasoned assessment of whether "in light of the evidence concerning frequency, regularity, and proximity of a plaintiff/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury." *Gregg*, 596 Pa. at 292, 943 A.2d at 227.

¶ 54 The Friction Product Defendants argue that the Supreme Court in *Gregg* "expressed its disdain" for expert testimony akin to that offered here by Dr. Maddox, which in some instances could permit a finding of liability based upon only a few *de minimis* exposures to asbestos containing products manufactured by a defendant. Chrysler's Second Supplemental Brief for Appellee, at 3. In *Gregg*, however, the Supreme Court did not address the scientific merit of expert testimony akin to that offered by Dr. Maddox in the case *sub judice*. To the contrary, *Gregg* did not involve a *Frye* challenge to expert scienti-

fic testimony or the methodologies employed by experts in reaching novel scientific opinions in tort cases. Unlike the present case, *Gregg* considered the proper standards for a trial court's grant of summary judgment in response to the filing of a "product identification" motion for summary judgment. The present appeal does not involve a product identification motion for summary judgment and neither party has raised any issues relating to the proper application of the "regularity, frequency and proximity" test to the facts presented here.

¶ 55 For these reasons, we will not equate the *Gregg* Court's analysis of a *de minimis* exposure under the "regularity, frequency and proximity" test for product identification purposes with a *de minimis* exposure of asbestos for purposes of a *Frye* challenge to the methodology used to reach an opinion on causation.[27] We also note that the parties in this case stipulated in advance of the *Frye* hearing that Simikian's exposure to asbestos was not *de minimis*, but rather involved a career of 44 years as an automobile mechanic prior to contracting mesothelioma.

¶ 56 For these reasons, we conclude that the trial court erred in granting the Friction Product Defendants' *Frye* motion and should not have granted summary judgment on that basis. Accordingly, we re-verse and remand for further proceedings consistent with this decision.

¶ 57 Reversed and remanded.

¶ 58 SHOGAN, J. files a Concurring Statement.

## CONCURRING STATEMENT BY SHOGAN, J.:

¶ 1 I concur in the result reached by the majority because I, likewise, conclude that our decision in *Trach v. Fellin,* 817 A.2d 1102 (Pa.Super.2003) (*en banc*) (holding that the logical process of extrapolation is a generally accepted methodology for supporting expert testimony) guides us to such a determination.

¶ 2 It is uncontested that Decedent worked as an automotive mechanic for over forty years. It has been alleged that Decedent's mesothelioma was caused by inhalation of asbestos-containing friction products from automotive manufacturers and suppliers. Appellant's expert opined that each and every exposure to asbestos during Decedent's employment contributed to his development of mesothelioma. In order to reach this conclusion, Appellant's expert utilized the method of logic known as extrapolation.

¶ 3 In *Trach,* this Court observed that extrapolation is not science but is a logical method "used to estimate the value of a

---

**27.** Another panel of this Court sitting *en banc* recently addressed the issue raised here by the Friction Product Defendants. *Estate of Hicks v. Dana Companies, LLC,* 984 A.2d 943 (Pa.Super.2009) (*en banc*). In *Hicks,* this Court affirmed a trial court's entry of judgment in favor of the estate of a pipe fitter who died from mesothelioma after a lengthy occupational exposure to asbestos. On appeal, the appellant contended that it was entitled to judgment notwithstanding the verdict based on a lack of evidence of causation pursuant to *Eckenrod* and *Gregg.* Appellant had not filed a *Frye* motion or otherwise challenged the admissibility of plaintiff's medical expert, who offered testimony similar to that of Dr. Maddox in this case (that "each and every breath" contributes cumulatively to the risk of contracting mesothelioma). *Id.* at 954.

In response to arguments by the appellee in *Hicks* substantially identical to those now raised by the Friction Product Defendants, namely that the "each and every breath" expert testimony is inadequate to establish causation in light of *Gregg,* this Court concluded that "[w]e can discern nothing in the *Gregg* opinion mandating the medical evidence presented by Appellee herein is automatically insufficient to raise a factual question of causation." *Id.* at 957.

variable outside its tabulated or observed range" or "to infer (that which is not known) from that which is known." *Trach*, 814 A.2d at 1114. As the Court in *Trach* further observed, extrapolation has gained general acceptance in the scientific community under certain circumstances. *Id.* at 1118. As long as the basic methodology employed to reach a conclusion is sound, the scientist may extrapolate from this sound scientific basis when it is impossible or unethical to perform the type of clinical trials that would yield definitive results. *Id.* at 1118. The Court in *Trach* further remarked that in a courtroom, the test for allowing a plaintiff to recover in a tort suit is not scientific certainty, but legal sufficiency. *Id.* Thus, it will be for a jury, aware of the fallibility of extrapolation, to decide the credibility of expert opinions. *Id.* at 1118–1119. It is for the defendants, through vigorous cross-examination, to prove that the opinions of experts lack credibility. *Id.* at 1119.

¶ 4 Here, the trial court attempted to distinguish *Trach* from the instant case by categorizing various types of extrapolation procedures and concluded that the extrapolation technique used in *Trach* was dissimilar from the technique used by the expert in the instant case. However, from my reading, *Trach* does not distinguish between various types of extrapolation techniques and is not limited in its holding.

¶ 5 Although well-intentioned, the trial court's struggle with this issue illustrates the complexity of the cases in which the bench and the bar are forced to untangle the opinions and analysis of experts in matters involving scientific study. However, I do not believe that the trial court was setting itself up as a "super expert[ ] in the

field of medicine." *See* Majority Opinion at 38, fn. 25. Rather, it was trying to conscientiously deal with this confusing area of the law within the context of the case before it.

¶ 6 No doubt similar cases with "friction product defendants" are pending within this Commonwealth's judicial system and, given the confusion that has surfaced on this subject, all would benefit from further guidance on this issue. This is especially true since a depleted *en banc* court of six members has participated in the consideration and decision of this case.[1] Accordingly, I respectfully suggest that it is desirable for our Supreme Court to address this matter and clarify the appropriate approach to be taken in cases involving experts employing extrapolation as a methodology to support their scientific opinions.

**In re J.P.**

---

1. Indeed, consideration of a case by a six member panel of a fifteen member court represents well less than a majority of the commissioned court members. In my opinion, a

majority opinion rendered by such a panel should not be given *en banc* precedential weight.